**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**UNITED STATES OF AMERICA**

**v.**

**GREGORY BUTLER,**
**DARRAN BULTER,**
**JAMES ROBERTS, and**
**D'ANDRE PRESTON**

     **Defendants**

**CRIMINAL No. PWG-19-137**

**GOVERNMENT'S AMENDED CONSOLIDATED RESPONSE**
**IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

**Erek L. Barron**
**United States Attorney**

**James Wallner**
**John Sippel**
**Assistant United States Attorneys**

**36 South Charles Street, Fourth Floor**
**Baltimore, Maryland 21201**
**410-209-4800**

**September 2, 2022**

i

## TABLE OF CONTENTS

I.  OVERVIEW ................................................................................................. 1

II. MOTION TO SUPPRESS WIRE AND ELECTRONIC INTERCEPTIONS ................. 3

   A.  BACKGROUND ............................................................................ 3

   B.  ARGUMENT ................................................................................. 5

      1.  THE AFFIDAVITS WERE SUPPORTED BY PROBABLE CAUSE ...... 5

      2.  THE AFFIDAVITS DEMONSTRATED NECESSITY ......................... 10

         a.  TARGET TELEPHONES 1, 2, and 4 .......................................... 10

         b.  TARGET TELEPHONES 14 and 16 ........................................... 15

      3.  MINIMIZATION REQUIRMENTS WERE FOLLOWED .................... 17

      4.  GOOD FAITH APPLIES TO WIRETAPS ................................. 20

III. SEARCHES AND SEIZURES BASED ON WARRANTS ......................................... 21

   A.  PHYSICAL LOCATIONS ................................................................. 23

      1.  GREGORY BUTLER ................................................................. 23

         a.  101 West Cross Street, Apartment 514 ................................... 23
         b.  3901 Cedardale Road ......................................................... 24
         c.  3204 Normandy Wood Drive Apartment E ................................ 25
         d.  720 Kent Avenue Unit 2396 ................................................ 26
         e.  Vehicles ......................................................................... 27
         f.  4502 Eli Drive Apartment C ................................................. 28

      2.  JAMES ROBERTS ................................................................. 29

      3.  *LEON* APPLICATION ......................................................... 30

   B.  CELLSITE LOCATION INFORMATION (CLSI) ..................................... 31

      1.  GREGORY BUTLER ................................................................. 32

         a.  443-641-4783 ................................................................. 32
         b.  347-744-5958 ................................................................. 34

2. DARRAN MALIK BUTLER ................................................................. 34

3. D'ANDRE PRESTON ........................................................................... 37

4. *LEON* APPLICATION ........................................................................ 38

C. INSTAGRAM .................................................................................................. 38

1. DARREN BUTLER ............................................................................... 38

2. D'ANDRE PRESTON ........................................................................... 41

D. CELLPHONE CONTENT ............................................................................. 43

IV. WARRANTLESS SEARCHES AND SEIZURES ............................................. 44

A. DARREN BUTLERS'S NOVEMBER 1, 2018 ARREST ............................. 44

1. FACTUAL BACKGROUND ................................................................ 44

2. ARGUMENT ......................................................................................... 45

B. D'ANDRE PRESTON'S MARCH 20, 2020 ARREST ................................. 53

1. FACTUAL BACKGROUND ................................................................ 54

2. ARGUMENT ......................................................................................... 55

V. SEVERANCE ....................................................................................................... 59

A. MOTION TO DISMISS AND SEVER COUNTS ........................................ 59

B. MOTION TO SEVER DEFENDANTS ......................................................... 66

VI. ADOPTED MOTIONS ......................................................................................... 70

A. MOTION TO STRIKE PARAGRAPHS FROM INDICTMENT ................... 70

B. MOTION TO DISMISS COUNT TWO ......................................................... 76

C. DISCOVERY MOTIONS ............................................................................... 78

1. MOTION TO EXCLUDE UNTIMELY EVIDENCE .............................. 78

2. MOTION TO IDENTIFY COCONSPIRATORS, THEIR STATEMENTS AND COOPERATORS ............................................................................ 79

3.      MOTION FOR BILL OF PARTICULARS ............................................ 81

4.      MOTION TO DISCLOSE EXPERTS....................................................... 84

5.      MOTION TO DISCLOSE 404(b) EVIDENCE ...................................... 84

VII.    CONCLUSION........................................................................................... 85

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **GREGORY BUTLER,** **DARRAN BULTER,** **JAMES ROBERTS, and** **D'ANDRE PRESTON** | **CRIMINAL No. PWG-19-137** |
| **Defendants** | |

**GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO**
**DEFENDANTS' PRE-TRIAL MOTIONS**

## I.   OVERVIEW

Beginning in 2016, the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Montgomery County Police Department (MCPD) initiated an investigation into a drug trafficking organization (DTO) that supplied drugs to overdose victims in Montgomery County.  That investigation merged with an investigation being conducted by the FBI, DEA, and Baltimore Police Department (BPD) into the murder of a federal witness W.E. who died from multiple gunshot wounds in June 2018.  Investigators determined that the same DTO that operated in and around the Edmonson Village in Southwest Baltimore was responsible for some of the overdose deaths in Montgomery County and elsewhere, as well as the murder of W.E.

This DTO operated at various locations but claimed allegiance to an area referred to as the "NFL," a reference to the adjacent and intersecting one-way streets south of Edmondson Avenue (Normandy Avenue, Franklin Street, and Loudon Avenue).  Beginning in October 2018 and concluding in May 2019, the Honorable Catherine C. Blake, United States District Court for the District of Maryland (Judge Blake), authorized the interception of wire and electronic

communications over several cellular phones utilized by targets of the investigation. Using a myriad of investigative techniques, law enforcement arrested nearly forty individuals connected to the NFL and identified several additional overdose deaths and acts of violence attributed to the enterprise. The investigation culminated in the racketeering indictment of several members of the NFL racketeering enterprise.

Four defendants, all of whom are charged in the RICO indictment, remain scheduled for trial in November of 2022. They include: the leader of the NFL, Gregory Butler, a/k/a "Sags," (G. Butler); James Roberts, a/k/a "Bub" (Roberts); Darran Butler, a/k/a "Malik" or "Lik" (D. Butler);[1] and D'Andre Preston (Preston). The Government previously filed a chart outlining the remaining defendants and the charges each face. The chart below identifies their outstanding pretrial motions.

| DEFENDANT | ECF# | MOTION |
|---|---|---|
| Butler, Gregory | 926 | Motion for Disclosure of 801(d)(2) Statements |
| | 942 | Motion to Exclude Untimely Evidence |
| | 943 | Motion to Suppress (Omnibus Motion) |
| | 946 | Motion to Adopt/Conform to CoDef motions |
| | | (925) Motion Dismiss and Sever Counts (D. Butler) |
| | | (931) Motion to Strike Paragraph 52 (Cannon) |
| | | (932) Motion to Suppress Wiretaps (Cannon) |
| | | (935) Motion Disclose Confidential Informants and Witnesses |
| | | (938) Motion to Disclose Expert Testimony (Cannon) |
| | | (939) Motion to Disclose Co-conspirator (Cannon) |
| | 947 | Motion for Disclosure of 404(b) Evidence |
| | 1143 | Suppress Cell Phone searches |
| -------------- | ----- | ------------------------------------------------ |
| Butler, Darran | 849 | Motion to Release Brady |
| | 922* | Motion to Suppress Evidence and Derivative Information |
| | 925 | Motion Dismiss and Sever Counts |
| | 926 | Motion for Disclosure of 801(d)(2) Statements |
| | 942 | Motion to Exclude Untimely Evidence |
| | 943 | Motion to Suppress (Omnibus Motion) (G. Butler) |

---

[1]     On September 1, 2022 (the day before the Government's Responsive Pleading was due), counsel for D. Butler informed Government counsel that D. Butler executed his plea agreement. Because D. Butler has yet to plead guilty and several defendants adopted his motions; to avoid rewriting entire sections of this response; and renumbering exhibits, the Government submitted its response without removing references to D. Butler's pretrial motions.

|  | 948 | Motion to Suppress Cell-Site Data |
|  | 1143 | Motion to Suppress Cell Phone Searches |
|  | 1146 | Motion to Sever |
|  | 1147 | Adopt other motions |
|  |  | (928) Motion to Dismiss Count Two (Cannon) |
|  |  | (935) Motion Disclose Confidential Informants and Witnesses |
|  |  | (939) Motion to Disclose Co-conspirator (Cannon) |
|  |  | (943) Motion to Suppress (Omnibus Motion) (G. Butler) |
|  | 1148 | Motion to Suppress IG Evidence |
| --------------- | -------- | ------------------------------------------------- |
| Roberts, James | 926 | Motion for Disclosure of 801(d)(2) Statements |
|  | 942 | Motion to Exclude Untimely Evidence |
|  | 1133 | Motion to Sever |
|  | 1134 | Motion to Suppress Wiretap |
|  | 1137 | Motion to Suppress Tangible Evidence |
|  | 1141 | Motion to Adopt CoDef Motions |
|  |  | (925) Motion Dismiss and Sever Counts (D. Butler) |
|  |  | (928) Motion to Dismiss Count Two (Cannon) |
|  |  | (929) Motion for Bill of Particulars |
|  |  | (931) Motion to Strike Paragraph 52 (Cannon) |
|  |  | (935) Motion Disclose Confidential Informants and Witnesses |
|  |  | (939) Motion to Disclose Co-conspirator (Cannon) |
|  |  | (940) Motion to File Additional Motions (Cannon) |
|  |  | (943) Motion to Suppress (Omnibus Motion) (G. Butler) |
|  | 1142 | Motion for Disclosure of 404(b) Evidence |
|  | 1143 | Motion to Suppress Cell Phone Searches |
| -------------- | -------- | ------------------------------------------------- |
| Preston, D'Andre | 819 | Motion to Sever |
|  | 920* | Motion to Suppress Evidence |
|  | 923 | Motion to Suppress IG |
|  | 926 | Motion for Disclosure of 801(d)(2) Statements |
|  | 942 | Motion to Exclude Untimely Evidence |
|  | 952 | Motion to Suppress Cell Data |
|  | 1089* | Motion for Daubert Hearing |
|  | 1143 | Motion to Suppress Cell Phone Searches |

\* Denotes the possible need for testimony

## II.     MOTION TO SUPPRESS WIRE AND ELECTRONIC INTERCEPTIONS

### A.     BACKGROUND

On October 1, 2018, Judge Blake authorized the interception of communications over two cellular telephones used by G. Butler ("Target Telephone 1" and "Target Telephone 2").

*See* Ex. 1 (Wiretap Paperwork for Target Telephone 1 and 2).[2]  The affidavit in support of the wiretap authorization detailed a two-year investigation of G. Butler and his use of those cellular telephones to sell narcotics to customers traveling to Baltimore.  Once investigators began intercepting the phones, they discovered the scope of the DTO, and that G. Butler coordinated drug sales between customers and subordinates, who provided drugs to these customers at locations throughout Baltimore.

On October 16, 2018, Judge Blake renewed the authorization to intercept Target Telephone 1 and 2, as well as a third phone used by G. Butler ("Target Telephone 4").  *See* Ex. 2.  From October 2018 through March 2019, Judge Blake continued to authorize interception of Target Telephones 1, 2, and 4.  Specifically, Judge Blake issued renewed authorizations on November 16, 2018 (Ex. 3), December 14, 2018 (Ex. 4), January 11, 2019 (Ex. 5), February 8, 2019 (Ex. 6), and March 7, 2019 (Ex. 7).

On January 25, 2019, Judge Blake authorized the interception of a telephone used by Roberts ("Target Telephone 14").  *See* Ex. 8.  On February 11, 2019, Judge Blake authorized the interception of a second phone used by Roberts ("Target Telephone 16").  *See* Ex. 9.  Judge Blake also renewed the interception of Target Telephone 16 on March 13, 2019.  *See* Ex. 10.

G. Butler moved to suppress interceptions over Target Telephone 1, 2, and 4. (ECF# 943). D. Butler and Roberts adopted G. Butler's motion to suppress the wiretaps on those lines (ECF# 1147 and 1141 (respectively)),[3] and Roberts moved individually to suppress the

_____

[2]     The Government provides as Exhibit 1 a complete set of documents for the initiation of  electronic intercepts.  These documents include the Application, signed by an Assistant United States Attorney; the Affidavit in Support of that Application, signed by the investigating law enforcement agent (the affiant); and the Order signed by a United States District Judge.  Because no defendant challenges the technical aspects of the application or orders for any of the lines or extensions thereof, the Government provided only the affidavit for all other lines and extensions, which are the primary subjects of the defendants' motions.  Should the Court require the additional documents the Government will provide them.

[3]     Because law enforcement intercepted both D. Butler and Roberts over the Target Telephone 1, 2, and 4 used by G. Butler, they are aggrieved persons and are entitled to move to suppress the interception of those Target

interceptions over Target Telephone 14 and Target Telephone 16 – devices used by him[4] (ECF# 1143).

### B.    ARGUMENT

G. Butler argued that: (1) the wiretap applications were not supported by probable cause; (2) that normal investigative procedures were not exhausted prior to initiating the wire interceptions, and (3) that the investigators failed to minimize the interceptions properly nor terminate the interceptions upon attainment of evidence.   Roberts, pertaining to Target Telephones 14 and 16, focused exclusively on the Government's alleged failure to exhaust properly alternative investigative techniques prior to seeking the interception of his phones.

As an initial matter, "[t]he defendant[s] ha[ve] the burden of demonstrating that a wiretap order is invalid." *United States v. Jayson*, 52 F.3d 322, *5 (4th Cir. 1995) (unpub.) (citing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)); *see also United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir. 1995) ("[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption.").   Furthermore, "great deference" should be paid to the determination of the issuing judge.   *United States v. DePew*, 932 F.2d 324, 327 (4th Cir. 1991); *see also United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992) ("determinations by an issuing judge are accorded substantial deference").

---

Telephones.  *See* 18 U.S.C. §§ 2518(10)(a) and (11).

[4]     Target Telephone 16 was transferred to co-defendant Bobby Cannon after Roberts's arrest on April 3, 2019.  G. Butler adopted (ECF# 946) co-defendant Bobby Cannon's Motion to Suppress the Interception of Target Telephone 16 (ECF #932), which Cannon filed prior to his guilty plea.  Cannon's motion extends primarily to the continued interception of Target Telephone 16 after the phone was transferred to him.  Cannon's argument is incorrect as a matter of law.  The wiretap order for Target Telephone 16 allowed for the interception of communications of the user of the phone (Roberts), and to others unknown.  Cannon's continued use of the device in furtherance of the identified crimes after Roberts's arrest placed him squarely in the classification of "others unknown."  *See United States v. Kahn*, 415 U.S. 143, 156 (1974).  To the extent that G. Butler has standing to suppress communications intercepted over Target Telephone 16 after April 3, 2019, his adopted argument would fail because the Government maintained authorization to intercept the communications of "other unknown" persons committing the enumerated crimes through the use of Target Telephone 16.

## 1.    THE AFFIDAVITS WERE SUPPORTED BY PROBABLE CAUSE

The federal wiretap statute, 18 U.S.C. § 2518 *et seq.* ("Title III"), permits a court to authorize the interception of communications over a telephone (i.e., a wiretap) upon a sufficient showing in a government application. Title III requires that a wiretap affidavit establish probable cause to believe that: (1) a person has committed, is committing, or will commit an offense; (2) communications about that offense will be intercepted; and (3) the target facility (i.e., the phone) is being used in connection with the offense. 18 U.S.C. § 2518(3).

The Fourth Circuit has held that the "probable cause required for issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant" because a wiretap is a special type of search warrant. *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983); *United States v. Brewer*, 204 Fed. Appx. 205, 207 (4th Cir. 2006).  Section 2518(3)(b) does not require proof beyond a reasonable doubt, but rather a "fair probability" that evidence of criminal conduct will be obtained through interception of communications.  *Id.*  Moreover, "[a]pplications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.'" *McKinney*, 785 F. Supp. at 1219 (quoting *United States v. Errera*, 616 F. Supp. 1145, 1149 (D. Md. 1985), and *Illinois v. Gates*, 462 U.S. 213, 237–38 (1983)).  In a close case, reviewing courts should resolve doubts in favor of upholding wiretap orders, as they do with respect to search warrants. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965).

Here, G. Butler failed to point to a single probable cause deficiency in any of the application or affidavits issued. The initial wiretap affidavit for Target Telephone 1 and 2 provided ample evidence to believe G. Butler used the telephones to coordinate drug trafficking sales. The affidavit summarized a two-year-long investigation that led to the first wiretap

application.  The affidavit described the August 2016 fatal overdose of "Victim 1."  Examination of Victim 1's cell phone revealed communications between Victim 1 and Target Telephone 1 that indicated that Victim 1 purchased drugs from the user of Target Telephone 1.  *See* Ex. 1 at 16-17.  Victim 1's messages with Target Telephone 1 also indicated that she purchased the drugs that caused her overdose through Target Telephone 1.  *Id*. at 17. The affidavit noted, however, that cell site analysis for Target Telephone 1 and Victim 1's phones never showed the two phones together, which seemed to indicate that the person who engaged in the hand-to-hand drug transaction with Victim 1 was a different person than the user of Target Telephone 1.  *Id*.  The affidavit for Target Telephone 1 also described other evidence of drug trafficking carried out through the user of Target Telephone 1 including:

- ▪ Drug-related communications between defendant Timothy Downing and Target Telephone 1 in August 2016. *Id.* at 17-18.

- ▪ An undercover police officer drug purchase in August 2016, arranged through Target Telephone 1. *Id.* at 18-19.

- ▪ The interview of a drug user who told police in March 2017 that he had been purchasing drugs via Target Telephone 1 for at approximately nine months. *Id.* at 20.

- ▪ Confidential source purchases of drugs from Target Telephone 1 in November 2017 and January 2018, and March 2018. *Id.* at 22-28.

- ▪ Butler's instructions to co-conspirators to continue the drug trafficking operation when he was detained in custody. *Id.* at 29-33.

The affidavits also established that G. Butler used Target Telephone 2 in furtherance of his drug trafficking operation.  The affidavit described instances of an inmate being intercepted on a jail phone, calling G. Butler over Target Telephone 2, and coordinating the smuggling of drugs into a detention facility.  *Id.* at 35-38.  The affidavit also described a detailed jail call in June 2018 between another inmate and G. Butler (using Target Telephone 2) where G. Butler

discussed his drug trafficking operation and was overheard speaking to a drug customer on a second phone. *Id.* at 38-44.  In another jail call, G. Butler discussed using the Dark Web to obtain drugs and was again overheard on a second phone arranging a drug sale to a customer.  *Id.* 38-44.

The affidavits established G. Butler as the user of Target Telephone 1 and 2.  G. Butler provided Target Telephone 1 to Baltimore County Police in August 2018, *id.* at 29, and Target Telephone 2 to file a police report in September 2017.  *Id.* at 34.  Baltimore Gas and Electronic (BGE) listed Target Telephone 2 for the contact number for G. Butler's residence.  *Id.* at 35.  In short, the affidavit demonstrated that G. Butler used Target Telephones 1 and 2 to distribute quantities of narcotics to drug customers throughout the Baltimore metropolitan area.

The affidavit in support of Target Telephone 4, which also renewed the interception of Target Telephones 1 and 2, revealed how investigators identified the phone as an additional phone used by G. Butler. *See* Ex. 2 at 27-28.  This included an intercepted jail call made to G. Butler over Target Telephone 4; examination of the phone's call detail records ("CDR") where G. Butler called known loved ones; and Global Positioning System ("GPS") data that showed Target Telephones 1, 2, and 4 traveling together and consistent with G. Butler's known movements.  The affidavit also detailed how a drug customer told Baltimore County Police he purchased drugs from the user of Target Telephone 4 and showed police Target Telephone 4 listed in his (the drug customers) own phone as his source.  *Id.* at 28.  The affidavit showed G. Butler coordinated two separate drug sales in October 2018 over Target Telephone 4, which investigators overheard while intercepting Target Telephones 1 and 2. *Id.* at 28-32. Thus, probable cause existed to intercept Target Telephone 4 because it was another phone Butler used to conduct drug trafficking.

As discussed earlier, Judge Blake continued to authorize interceptions of Target Telephone 1, 2, and 4 through March 2019. G. Butler does not appear to argue that the renewed affidavits failed to establish probable cause. Nonetheless, review of those affidavits demonstrated probable cause to believe that G. Butler continued to use the phones in furtherance of the drug trafficking operation.   Each affidavit described numerous drug trafficking conversations intercepted over the phones.

The November 16, 2018 affidavit for renewed interception of Target Telephones 1, 2, and 4 detail, among other evidence: (1) two narcotics sales to Syed Hussain, *See* Ex. 3 at 13-14; (2) G. Butler complaining about the quality of drugs, *id.* at 15-16; (3) G. Butler telling Emmanuel Watkins that he needed him to process cocaine into cocaine base, *id.* at 18-19; and (4) G. Butler arranging a 90-gram and 60-gram sale of narcotics to John Wolfrey. *Id.* at 20-21. The affiant then provided for each interception identified in the affidavit an analysis of the coded language, based upon the affiant's extensive training and experience.   Moreover, law enforcement's interdictions of narcotics and other surveillance corroborated the events described in the affidavits.

The December 14, 2018 affidavit for renewed interception of Target Telephones 1, 2, and 4, continued to reveal evidence of G. Butler's drug trafficking operation.   For example, the affidavit discussed six different drug sales G. Butler coordinated using Target Telephone 1, *see* Ex.4 at 13-16; G. Butler discussed his interest in obtaining an "untraceable" cell phone*, id.* at 17; G. Butler requested that his mother deliver sleeping pills to him that the affiant's believed were needed to adulterate the drugs, *id*. 18; and G. Butler discussed drug supplies and product quality with members of his organization. *Id* at 20-21.

The January 11, 2019 affidavit for continued authorization to intercept Target Telephones

1, 2, and 4 detailed multiple interceptions between G. Butler and drug customers where G. Butler agreed to sell narcotics and directed customers to specific locations for the transactions. *See* Ex. 5 at 12-15 and 17-20. The affidavit also discussed G. Butler's attempts to obtain drugs for Juawan Davis, a recently arrested member of his DTO. *Id.* at 15-16. The affidavit also contained detailed interceptions where Butler discussed with members of the DTO paying for Davis's attorney, *id.* 18-19; and where to send drug customers. *Id.* at 19-20.

The February 8, 2019 affidavit for continued authorization to intercept Target Telephones 1, 2, and 4 likewise contained detailed calls between G. Butler and drug customers where he arranged drug sales. *See* Ex. 6 at 11-14; 14-17; 17-21. The affidavit also showed G. Butler continued oversight of his DTO even after his arrest and that co-conspirators continued to use the Target Telephones 1, 2, and 4 to sell drugs. *Id.*

Finally, the March 7, 2019 affidavit for continued authorization to intercept Target Telephones 1 and 2 showed G. Butler's use of Target Telephone 1 and 2, following his release from custody. The affidavit showed additional drug sales coordinated by over the phones to customers. *See* Ex. 7 at 11-15. The affidavit also described calls between G. Butler and co-conspirators where he continued to direct his street-level distributors to conduct drug sales. *Id.*

### 2. THE AFFIDAVITS DEMONSTRATED NECESSITY

#### a. Target Telephones 1, 2, and 4

Sections 2518 (1)(c) and (3)(c) of Title 18 require the government, in seeking wiretap authorization, to show either that "other investigative procedures have been tried and failed" *or* that "they reasonably appear to be unlikely to succeed or to be too dangerous." 18 U.S.C. § 2518(1)(c), (3)(c). The "necessity" requirement was designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation

nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994); *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

The Fourth Circuit has explained that law enforcement officers "need not exhaust every conceivable investigative possibility before seeking a wiretap order." *United States v. Clerkley*, 556 F.2d 709, 715 (4th Cir. 1977). Rather, "the exhaustion requirement is to be tested in a practical and common-sense fashion." *Id*. Although the government cannot show exhaustion through "a mere boilerplate recitation of the difficulties of gathering useful evidence," *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995), the burden on the government is "not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not unduly hamper the investigative powers of law enforcement agents." *See United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007); *see also United States v. Sellers*, 512 Fed. Appx. 319, 329 (4th Cir. 2013) ("[T]he showing of 'necessity' for the wiretap is not prodigious and the Government need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence such that wiretapping becomes reasonable.").

Courts have also found that a proper showing of exhaustion can more easily be made in complex cases, such as this one, in which the goal of wiretapping certain phones is to successfully investigate and prosecute large-scale organizations. *See Clerkley*, 556 F. 2d at 714; *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir. 1997); *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir. 1998) (government's affidavit provided sufficient evidence to allow the reviewing court to determine that a confidential informant would not be able to proffer information regarding the upper levels of the target conspiracy).

The Fourth Circuit has held that the determination of the issuing judge that a wiretap is necessary is reviewed under a highly deferential "abuse of discretion" standard. *Wilson*, 484 F.3d at 280 (4th Cir. 2007); *see also Oriakhi*, 57 F.3d at 1298 ("considerable deference" should be given to a district court's determination that exhaustion requirement is met); *Smith*, 31 F.3d at 1298 (standard of review should be one that gives the issuing judge's exhaustion determination "considerable deference"). Drug and gang investigations, in particular, suffer from common investigatory problems that lead to permissible boilerplate language in wire affidavits. Courts applying a commonsense approach recognize that experienced agents repeatedly run into the same problems in these types of investigations, and so necessity recitations that appear to be boilerplate reflect the reality of the type of investigations rather than canned responses

Here, the initial wiretap affidavit for Target Telephones 1 and 2 provided a thorough analysis of the goals of the investigation, *see* Ex. 1 at 5-6, and the various investigative techniques that had been attempted or considered, which established the necessity for the authorization. *Id.* at 45-58. The affidavit described specific instances where investigators used confidential sources and an undercover officer to purchase narcotics from Target Telephone 1 and explained the limitation of street-level drug purchases from a high-level drug trafficker like G. Butler, who used subordinates to conduct the hand-to-hand transactions. *Id.* at 47. The affidavit also discussed the limitations of the physical surveillance and pole cameras that investigators used due to the organization's history of rotating locations where they sold drugs and operation in areas where law enforcement would easily be detected. *Id.* at 49-51. The affidavit also discussed law enforcement's past efforts to use search warrants, tracking warrants, historical cell site search warrants, and pen registers to investigate G. Butler. The affidavit explained that cellular tracking only yielded general information about G. Butler's movements

12

and that tracking of his vehicles was of limited value by itself, due to his use of multiple vehicles. *Id.* at 51-54. The affidavit explained an unsuccessful trash pull from G. Butler's residence and noted that despite their efforts, agents had not identified where he stored narcotics. *Id.* at 53-54. The affidavit also discussed how investigators conducted a financial investigation of G. Butler, which revealed minimal financial information about Butler. *Id.* at 57-58. In short, the wiretap authorization was the culmination of a deliberate, years-long investigation of G. Butler that was necessary to further investigators' goals.

Similarly, the affidavit for Target Telephone 4, and the subsequent affidavits that sought renewed authorization to intercept Target Telephones 1, 2, and 4, described the investigative techniques used and those techniques that were not attempted. *See* Ex. 2 at 40-54, Ex. 3 at 29-41, Ex. 4 at 23-37, Ex. 5 at 40-54, Ex. 6 at 26-39, and Ex. 7 at 21-37. The affidavits did not simply regurgitate boilerplate language from the prior affidavits. Rather, each affidavit updated the Court on the investigative techniques that investigators continued to employ even after the initiation of the wiretaps. For example, the initial wiretap affidavit for Target Telephone 4 discussed that investigators, relying on the wiretap, interdicted 79 grams of narcotics from a drug courier who purchased narcotics from the G. Butler organization. The affidavit explained that the intended recipient of the drugs learned of the courier's arrest and notified G. Butler. *See* Ex. 2 at 45, 50. This demonstrated that investigators continued to employ other investigative techniques, such as drug interdictions, and demonstrated to the court the need for interceptions. Similarly, in the November 16, 2018 affidavit, investigators described observing G. Butler using a fourth cell phone, demonstrating the highly compartmentalized nature of G. Butler's DTO. *See* Ex. 3 at 33. The affidavits noted that after law enforcement arrested Kareem Mack, a street-level distributor in the organization, for possessing a large quantity of narcotics, the organization

continued to operate, albeit with greater caution; for instance, Desmond Ringgold, another member of the DTO, immediately stopped using his cell phone.  *See* Ex. 4 at 31, 34-35.

G. Butler argued that investigators could have achieved the investigative goals by small street-level purchases of narcotics from the user of Target Telephone 1 and 2.  As the affidavit demonstrated, these small drug purchases would not have provided the confidential sources or undercover officers insight into the entire DTO; where the organization stored narcotics; or the identities of sources of supply.  *See* Ex. 1 at 46.  The affidavit further established that G. Butler relied on others to conduct the drug transactions with customers, presumably so he would not implicate himself.  *See id.* at 48-49.  Further, the affidavit described the unlikely circumstance of a higher-level drug trafficker, like G. Butler, describing the inner workings of his criminal enterprise with street-level drug customers (i.e., drug users).  *Id.*

G. Butler also argued that investigators prematurely dismissed the further use of trash pulls at G. Butler's home.  This argument not only ignores the complex multi-tentacled operation, but the affidavits established that G. Butler worked with multiple people to distribute large quantities of drugs at rotating locations.  Agents, at that time, had been unable to identify how G. Butler and his organization obtained drugs, who sourced them, where the organization processed and stored the drugs, the structure of the organization, nor all of the members.  Even assuming the risks of conducting other "trash runs," which were highlighted in the affidavit, the likelihood that a search warrant based on that single trash run could meet the goals of the investigation was naïve at best.

G. Butler also argued that the later use of tracking warrants by investigators undercuts their assertions in earlier affidavits that tracking warrants were insufficient to achieve the goals of the investigation; but, the law does not require investigators to abandon all other investigative

techniques once interceptions commence.   Rather, the law requires the continued need for interception, regardless of the techniques employed by investigators, each time investigators seek authorization.   The renewal affidavits disclosed to the court that investigators continued to use tracking warrants to further the investigation, but the affidavit also made clear the limitations of such techniques, and the need for continued interception. *See* Ex. 4 at 36 (discussing how defendant Hall stopped using a phone that investigators were tracking and the need for continued interception to identify his new phone); *See* Ex. 5 at 53 (discussing the imprecise nature of GPS tracking data); *See* Ex. 6 at 38 (discussing co-conspirator Ringgold's termination of use of a phone without identification of his new number).

Finally, G. Butler argued that because the affidavits often described how certain techniques were unlikely to succeed, that this did not rise to the level of necessity; but, necessity does not require investigators to rule out every possible technique.   Rather, investigators need only present sufficient evidence to show that wiretapping is reasonable given the difficulties investigators   encountered during the investigation.   *Sellers* 512 Fed. Appx. at 329 ("[T]he showing of 'necessity' for the wiretap is not prodigious and the Government need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence such that wiretapping becomes reasonable.").

In sum, review of the entirety of the wiretap affidavits demonstrated that the affiants explained in detailed, case-specific information, how other investigative procedures either had been tried and failed, or reasonably appeared to be unlikely to succeed or to be too dangerous. *See* 18 U.S.C. § 2518(1)(c), (3)(c).   That is all that the necessity requirement demands.

### b.      Target Telephone 14 and 16

Like, G. Butler, Roberts argued that investigators failed to exhaust alternative investigative techniques prior to seeking authorization to intercept his telephones, Target Telephones 14 and 16.   Roberts posited that law enforcement must employ "technological surveillance" developed since the passage of Title III to exhaust effectively the necessity for wire interception.   After making this argument, Roberts then conceded that law enforcement "relied on a majority of these techniques," *see* Def's Motion ECF# 1134 at 6, before claiming that regardless investigators failed to exhaust traditional investigative technique.

Roberts, in his motion, then ticks through the various normal investigative techniques employed by the affiant and claimed broadly each effort insufficient to warrant authorization for the interception of Target Telephone 14 and 16.[5]   In particular, Roberts claimed that the affidavit failed to address the individual need to intercept him or why a particular investigative technique, if employed, would fail as to him.

First, Roberts incorrectly assumed that his arrest and/or prosecution was the sole goal of the investigation.   By the time, law enforcement sought interception of his telephones, the wire interception portion of the investigation reached to fourteen different phones with a stated goal of "dismantle[ing]…the DTOs operating near the Edmondson Village area of Southwest Baltimore."   *See* Ex. 8 at 26 and Ex. at 29.   Roberts amounted to just one individual in a sprawling conspiracy, and interception of his telephones might "identify the narcotics suppliers used by the DTOs operating in the area" – another goal of the investigation.

The affidavit then listed, specifically as to Roberts, the need for interception of his phones.   As to the use of controlled purchases and undercover officers, the affidavit explained that law enforcement attempted those investigative techniques earlier in the investigation but

---

[5]         Roberts did not identify any insufficiencies in the affidavit to intercept Target Telephone 16, nor did he submit as an Exhibit that Affidavit.

believed that Roberts was a "supervisor" of the DTO and was "unlikely to carry out street-level sales." Moreover, the affidavit mentioned that Roberts "did not deal directly with customers…and would be skeptical of being contacted by strangers" or approached by undercover officers, which the affidavit noted would be too dangerous to employ. *Id.* at 27.

Regarding physical surveillance, law enforcement admitted that they had yet to identify where Roberts distributed drugs (because he did not conduct street-level sales). *Id.* at 29 and Ex. 9 at 32. Moreover, the affidavit noted that the imprecise information obtained from court-authorized GPS tracking of Roberts phones limited law enforcement's ability to conduct surveillance effectively. *Id.* at 33-34.

The affidavit also mentioned that Roberts used multiple telephones; was identified as "significant member of the organization;" and used encrypted applications. *Id.* at 36.

Finally, Roberts ignored the incorporation of prior affidavits, *id.* at 12 and Ex. 9 at 13, which listed throughout the entire investigation the techniques law enforcement employed, attempted to employ, or did not employ for specific reasons. Those affidavits also demonstrated the various problems law enforcement encountered without the interception of communications.

At bottom, the necessity requirement, as noted above, is to be tested in a practical and common-sense fashion; does need to exhaust every conceivable investigative possibility, *see Clerkly*, 556 F.2d at 715; and should be reviewed under a highly deferential "abuse of discretion" standard. *See Wilson*, 484 F.3d at 280. The affidavits provided more than enough information for Judge Blake to determine that the Government satisfied those standards.

### 3.   MINIMIZATION REQUIREMENTS WERE FOLLOWED

The Fourth Circuit has directed courts to consider three principal factors in assessing whether minimization requirements were properly observed: "(1) the nature and scope of the

alleged criminal enterprise; (2) the government's reasonable expectation as to the content of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed." *Clerkley*, 556 F.2d at 716.  The thoroughness of the government's precautions to bring about minimization and the degree of judicial supervision over the surveillance practices provide strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation. *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

Where, as here, "law enforcement officials are confronted with a large, far flung and ongoing criminal activity involving multiple parties," the Fourth Circuit has held that "they are afforded greater latitude in conducting wiretaps." *Clerkley*, 556 F.2d at 716; *see also United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975) ("Large and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far flung conspirators and to delineate the contours of the conspiracy."); *United States v. Cox*, 462 F.2d 1293, 1300–01 (8th Cir. 1972) ("[W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls made during several days does not constitute a failure to minimize simply because in retrospect it can be seen that a substantial portion of them had no evidentiary or investigative value."); *Charles*, 213 F.3d at 22 (observing that, when an investigation involves a drug ring of unknown

18

proportion, "the need to allow latitude to eavesdroppers is close to its zenith"); *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989) (holding that leeway is especially important when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped"); *United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994).

In addition, where, as here, conspiracies use "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway." *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989); *see also United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992); *Daly,* 535 F.2d at 441. Moreover, because participants in a conspiracy may "often discuss[] personal and criminal matters in the same conversations," *United States v. Wilson*, 835 F.2d 1440, 1445 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010), it is unreasonable for monitoring agents to cease monitoring every time non-criminal matters are mentioned. *See also United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002).[6]

Even if there is a failure to properly minimize some calls, the remedy is not suppression of all the intercepted conversations. *See Cox*, 462 F.2d at 1301–02; *United States v. Sisca*, 361 F.Supp. 735, 746–47 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874–77

---

[6]    In assessing a defense minimization challenge, courts generally draw a line at the two- or three-minute mark and exclude such short-duration calls from consideration. *See, e.g., United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes."); *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992) (expressing reluctance to conclude that listening to all calls for two minutes or less irrespective of relevance violated minimization requirements); *United States v. Cleveland*, 964 F. Supp. 1073, 1092-94 (E.D. La. 1997) (excluding calls less than three minutes in duration). *See also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) ("Following *Scott*, some courts have held that calls less than two minutes do not require minimization. We certainly agree that minimization of short calls is not required."); *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir. 1976) (monitoring all calls for a maximum of five minutes not unreasonable where interceptees frequently communicated in code and where discussions initially personal often turned later to criminal conduct). The rationale for listening to the first several minutes of a conversation is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Scott v. United States*, 436 U.S. 128, 142 (1978).

19

(E.D.N.Y. 1972). Rather, the remedy is simply to suppress the portions of any calls identified by the defendant that resulted from the failure to properly minimize. *See id.*

G. Butler claimed that search warrant affidavits in this case contain transcripts of innocuous conversations that should have been minimized. Butler does not, however, provide any examples of these conversations. The fact that these alleged innocuous conversations were included in affidavits used to establish probable cause for the issuance of federal search warrants undercuts his argument. The wiretap orders issued by Judge Blake required government investigators to monitor in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and specifically outlined how to determine whether intercepted communications were to be minimized. *See e.g.*, Ex. 1 at 58-61, Ex. 2 at 54-56, Ex. 3 at 41-43, Ex. 4 at 38-40, Ex. 5 at 55-58, Ex. 6 at 40-43, and Ex. 7 at 37-40.

Prior to the commencement of interception, the Government provided monitors with a memorandum outlining the guidance for minimization, including the application of privileges. These memoranda instructed the monitors about their minimization obligations, including the special procedures for the minimization of text messages, how to deal with situations where no party to a conversation is a suspected participant in criminal conduct, where one party is a suspect and where both parties are suspects, and the nature of potential privileges that require minimization. *See, e.g.*, Ex. 11.[7]

Moreover, approximately every fifteen days, the Government provided Judge Blake, the Judge supervising the interceptions, a report on the progress of the investigation. These Court Reports detailed the evidence developed, a summary of some of the pertinent calls, and a report

---

[7]     The Government provides Exhibit 11 as an example of a minimization memorandum that provided instructions to individuals live monitoring the interception of communication. Upon each new line being authorized, the Government provided updated minimization instructions describing the new named target subject (if any), additional crimes under investigation (if any), and other information pertinent to the interception of the new phone. The continued authorization of any existing phone followed the same minimization instructions.

on the minimization efforts the monitors employed.  *See, e.g.,* 12.[8]  Each report then requested approval by the Court to continue to monitor the various telephones.

In sum, the thoroughness of the government's precautions to bring about minimization, the degree of judicial supervision over the surveillance practices, and G. Butler's failure to identify any specific problems with the minimization protocols (either in concept or in practice) should lead the Court to conclude the minimization requirements were properly met.

### 4.       GOOD FAITH APPLIES TO WIRETAPS

Finally, it is clear that Judge Blake's wiretap orders complied with the requirements of the law.  As such, the investigators were entitled to rely on facially valid wiretap orders that the resulting evidence would be admissible pursuant to the "good faith" exception of *United States v. Leon*, 468 U.S. 897 (1984).  *Leon* has been applied to admit electronic surveillance evidence. *See United States v. Brewer*, 204 Fed. Appx. 205 *3 (4th Cir. 2006) (unreported) (even if affidavit lacked probable cause or exhaustion requirements had not been met, affiants were entitled to rely on facially valid wiretap order); *United States v. Moore*, 41 F.3d 370 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be denied, despite defect in order allowing electronic surveillance).  Therefore, even assuming, *arguendo*, that the affidavits were invalid the evidence may properly be received under the good faith exception to the exclusionary rule.

### III.   SEARCHES AND SEIZURES BASED UPON WARRANTS

Two of the defendants (G. Butler and Roberts) filed motions to suppress evidence law enforcement obtained through the execution of search warrants.  Importantly, neither defendant alleged an error or omission in any warrant nor have they produced any affidavit alleging

---

[8]       The Government provides Exhibit 12 as an example of a Court Report submitted for each intercepted line approximately every fifteen days.  In the event the Government requested continued authorization to intercept a particular phone, the application and affidavit in support of continued interception sufficed as the next Court Report.

falsehoods necessitating a *Franks* hearing.  *See Franks v. Delaware*, 438 U.S. 154 (1978).

In analyzing a warrant, the test for probable cause is totality of the evidence, and reliability is only one factor among many the magistrate could consider.  Once a search warrant has been issued, review of the probable cause determination by the judicial officer (usually a magistrate judge) is to be shown "great deference."  *United States v. Blackwood*, 913 F2d 139, 142 (4th Cir. 1990).   The reviewing court must limit its inquiry to asking "only whether the magistrate had a 'substantial basis...for concluding' that probable cause existed." *Id.*, (quoting, *Illinois v. Gates*, 462 U.S. 213, 238 39 (1983)).  To find probable cause, the magistrate must simply "make a practical common-sense decision whether, given all the circumstances in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*; *Massachusetts v. Upton*, 466 U.S. 727 (1984)(probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched.");  *See also United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)(same). "Only the probability and not prima facie showing of criminal activity is the standard of probable cause."  *Blackwood*, 913 F.2d at 142, (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

The task of the reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence on the record to support the decision of the issuing judge.  *Upton*, 466 U.S. at 728.  In drug investigations, like here, courts routinely uphold warrants to search residences, even temporary abodes, and vehicles on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes. *See United*

*States v. Grossman*, 400 F.3d 212, 217–18 (4th Cir.2005).

Even if there was a deficiency in the probable cause showing in the search warrant affidavit, the good faith exception would preclude application of the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). As the Supreme Court explained in *Leon,* "The deterrence purpose of the exclusionary rule is not achieved through the suppression of evidence obtained by 'an officer acting with objective good faith within the scope of a search warrant issued by a magistrate." *United States v. Perez*, 393 F.3d 457, 461 (4th Cir.2004) (quoting *Leon*, 468 U.S. at 920). Accordingly, under *Leon's* "good faith" exception, evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was "objectively reasonable." *Id*. (quoting *Leon*, 468 U.S. at 922).

"Usually, a warrant issued by a magistrate suffices to establish that a law enforcement officer has acted in good faith in conducting the search," *United States v. Doyle,* 650 F.3d 460, 467 (4th Cir.2011), and an officer's reliance on a warrant is objectively reasonable unless: "(1) the magistrate or judge was misled by information in an affidavit that the affiant knew was false or would have known was false but for his reckless disregard of the truth; (2) the magistrate wholly abandoned the role of a detached and neutral decision maker; (3) the affidavit supporting the warrant is so lacking in indicia of probable cause as to render the officer's belief in its existence totally unreasonable; or (4) the warrant is so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid." *Id.* at 467–70.

## A.    PHYSICAL LOCATIONS

### 1.    Gregory Butler

G. Butler moved to suppress the evidence obtained from several locations: (1) 101 West

Cross Street; (2) 3901 Cedardale Road; (3) 3204 Normandy Wood Drive Apartment E; (4) 720 Kent Avenue, Unit 2396; (5) 4502 Eli Drive Apartment C; and (6) four different vehicles used by him.  (ECF# 943).  Likewise, Roberts moved to suppress the evidence obtained from search of: (1) 2830 The Alameda and (2) a silver Honda.  (ECF# 1137).

G. Butler began his analysis of the probable cause to search each of the locations attributed to him by claiming that the probable cause contained within a multi-location search warrant (Exhibit 13) relied on unlawful wiretaps and conclusory statements by the affiant.  G. Butler claimed that this information was based on supposition and cannot support probable cause to search any of the locations; however, G. Butler ignored the first few pages of the affidavit where the affiant, in some detail, outlined the information gleaned from the investigation as well as his training and experience (that a magistrate judge may rely upon), to bolster the probable cause as to each location.

The affiant explained in the opening paragraphs his specialized training and experience in drug trafficking investigations; cellular telephone use among drug traffickers; and "the patterns of activity of drug traffickers…and the methods, language, and terms that are used to disguise the source and nature of profits of illegal drug dealing."  *See* Ex. 13 at 8.  The affiant also explained that "it is common for drug dealers to conceal contraband, proceeds of drug sales, and records of drug transactions in secure locations within their *residences*, *vehicles*, and/or businesses."  *Id.* (emphasis added).

With the affiant's experience detailed, the magistrate judge then learned that law enforcement investigated G. Butler and determined that he operated a DTO.  The affiant then explained the structure of the DTO gleaned from their interception of G. Butler's phones, and the various roles of its members.  The affiant then provided examples of typical drug transactions

24

complete with the interception of coded communication, based upon the affiant's experience, the quantity of drugs, and the corresponding surveillance of drug transactions at locations provided by G. Butler over the intercepted phones.  The affiant then explained, "[t]hese interceptions are only several of numerous drug transactions conducted via [the intercepted phones]…the DTO conduct[ed] drug transactions throughout the day on a nearly daily basis from October 2018 to [March 29, 2019]."

### a.    101 West Cross Street, Apartment 514

With this context, the affiant then explained that G. Butler resided at 101 West Cross Street Apartment 514, identified as Target Location 1 in Exhibit 13; that court-authorized tracking of his cellular phone[9] placed him near that location during overnight hours; and that on several occasion, investigators observed G. Butler exit the location, including during a purported drug transaction arranged over the intercepted phones.  The warrant also outlined that G. Butler provided his apartment number to the management company for 101 West Cross Street during an intercepted call, and that during intercepted calls investigators believed they overheard a money counter being used in the background.  Finally, the warrant explained that during an intercepted jail call Butler instructed his mother, Darlene Best, to remove money from the location after which a woman, matching Best's description, entered the location and left with a bag believed to contain $70,000 in drug proceeds.  *See* Ex. 13 at 14-15.

### b.    3901 Cedardale Road[10]

---

[9]    The interception of wire and/or electronic communication over G. Butler's telephones also authorized the receipt of real-time location information for the intercepted devices.

[10]    While G. Butler moved to suppress this search, he has failed to demonstrate what reasonable expectation of privacy he possessed in this location.  In *Minnesota v. Carter*, the Supreme Court determined property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property.  525 U.S. 83, 90 (1998).  In *Carter*, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not, and the Court determined that two individual who were present to bag cocaine lacked standing to challenge the search of the location.  *Id.  See also, United States v. Gray*, 491 F.3d 198 (4th Cir. 2007).

G. Butler next moved to suppress the search of his stash house, identified as Target Location 5 in Exhibit 13. Again, the affidavit detailed several incidents of G. Butler using the location to process drugs. *See* Exhibit 13 at 32-38. On a few occasions, investigators noted "chopping and scarping sounds," *id.* at 33, during intercepted communications after which investigators observed G. Butler leave the location. The investigators believed that G. Butler took the recently processed drug to meet Edward Hall, his "tester,"[11] whom later reported to G. Butler, "[m]an that shit got my burning bruh," which the affiant interpreted as Hall reporting to G. Butler the quality of the drugs G. Butler prepared inside the location and the user ingested.

Additionally, after his arrest on assault charges, G. Butler over a recorded jail phone, contacted his mother, Darlene Best, and his girlfriend, Darlene Cook, and directed them to contact other members of the DTO and to travel to the location. Investigators later observed two women enter the location and over a jail call, G. Butler instructed Best and Cook to weigh the drugs inside the location, including where to find the scale. Cook eventually reported, "it's 821.5."

Finally, even after his release on the assault charges, G. Butler continued to use the location to process drugs, and the affidavit noted several more occurrences where G. Butler was present at the location and discussing drug trafficking while inside the location.

### c.   3204 Normandy Wood Drive, Apartment E[12]

G. Butler next moved to suppress the search of his mother's home, identified in Exhibit 13 as Target Location 8.

As previously noted, Darlene Best, G. Butler's mother, involved herself with operations

---

[11]     A drug user, who ingests drugs for traffickers, and reports on the quality of the high induced.
[12]     While G. Butler moved to suppress this search, he has failed to demonstrate what reasonable expectation of privacy he possessed in this location. This location purports to be his mother, Darlene Best's, home. G. Butler was not present at the time of the search, and maintained his own domicile.

of the DTO.   At a minimum, she removed money from 101 West Cross Street and made arrangement for the continued operation of the DTO after G. Butler's arrest.   The affidavit outlined that Best listed this location with the Maryland Vehicle Administration (MVA) as her home and she provided the address to law enforcement following a traffic stop.  *See* Ex. 13 at 48-54.

The affidavit also noted that Best and G. Butler spoke regarding a package that Best described as "Benadryl," but G. Butler explained was "Dormin's."   G. Butler then instructed Best to bring the package to him from the location to a hookah lounge.   According to the affiant, Dormin's is a brand of sleeping pill, and that based upon the investigation, G. Butler adulterated his drugs with sleeping pills.

Finally, investigators observed G. Butler travel to this location after leaving the Midnight King Hookah Lounge, where investigators previously observed G. Butler conduct purported drug transactions.   G. Butler traveled from the lounge to the location and from there to 101 West Cross Street – his residence.

### d.    720 Kent Avenue, Unit 2396

G. Butler moved to suppress the search of a storage locker, identified in Exhibit 13 as Target Location 9, and claimed that "no facts presented in the affidavit warranted a search."  Def Motion at 17.

Similar to the other searches he moved to suppress, G. Butler confined his analysis of probable cause to search the storage locker to the few facts listed under the heading in the affidavit dealing with storage locker.   *See* Ex. 13 at 54-55.   He ignored the preceding fifty plus pages of probable cause where the affiant outlined the sophisticated DTO operated by G. Butler with the occasional help of his mother.   Even considering the negative dog scan, probable cause

27

still existed to search the location. Throughout the affidavit, G. Butler relied upon his mother to deal with issues associated with this DTO. He requested to have her pay for a storage locker, where, based upon the affiant's training an experience, drug traffickers often secure proceeds or contraband, including cutting agents or packaging material that may not result in a positive dog scan. Given these facts, a magistrate judge would find it perfectly reasonable and supported by probable cause under the "totality of the circumstances" that evidence of drug trafficking could be located inside a storage unit paid circuitously by the mother (and member of the conspiracy) of a prolific drug trafficker.

### e.   Vehicle Search

Again, G. Butler ignored the entire affidavit in conducting his analysis of probable cause to search the four vehicles identified in the affidavit as Target Vehicles 1, 2, 3, and 4, and claimed that the warrants were deficient. In short, each of the four vehicles were registered to Butlers Family Enterprises, LLC, a limited liability company formed by G. Butler, and investigators observed G. Butler operate each of these vehicles "on multiple occasions…to drive to locations where Butler conduct[ed] drug transaction with co-conspirator." *See* Ex. 13 at 56. Investigators also noted that when Butler traveled to the stash house or his home, he would operate Target Vehicles 1, 2, 3, and 4 to transport drugs or drug proceeds. *Id.* Although not specifically identified throughout the affidavit, the affiant noted that Butler operated black, silver, white, and gold Hondas as well as a truck. Alone, these observations would likely permit searches of the vehicle without a warrant. *See Carroll v. United States* 267 U.S. 132 (1925); nevertheless, law enforcement sought warrants based upon G. Butler's near daily trafficking of drugs and his use of the vehicles to travel between various location. The daily drug trafficking and use of these vehicles coupled with the affiant's experience that drug dealers commonly

conceal contraband, proceeds of drug sales, and records of drug transactions in vehicles provided more than ample probable cause to issue the warrants.

### f.      4502 Eli Drive, Apartment C

G. Butler also moved suppress the search of the above address.  BPD searched this address in 2016 after a detailed investigation by detectives from their Southwest District Drug Enforcement Unit.  The affiant, Hovhannes Simonyan, based his search on a detailed affidavit attached as Exhibit 14.  In short, Simonyan and other detectives arrested members of G. Butler's DTO, Antwan Cottman and Desmond Ringgold after a traffic stop, where they seized approximately 67 grams of heroin.  The traffic stop led to two search warrants at Cottman's residence that resulted in the recovery of additional quantities of heroin and cocaine.  The detectives then listened to recorded jail calls between Cottman and a person later determined to be G. Butler, where the two discussed, often in coded language, the continued distribution of drugs and the events surrounding Cottman's arrest.  *Id.* at 9-11.  Detective then obtained court-authorization to track the cellphone Cottman called from jail and determined the phone was used by G. Butler.  The detectives then identified Butler's residence, observed him entering and exiting it, and sought authorization from the Maryland District Judge to search the location.  These facts articulated in greater detail in Exhibit 14 offer more than sufficient probable cause to search a drug dealer's residence.

### 2.      James Roberts

As noted, Roberts moved to suppress the search of a residence, 2830 The Alameda, that he shared with a female, and a silver Honda Accord he operated (ECF# 1137).  Roberts alleged that the warrant failed to provide probable cause, but then listed in his motion the various observations that the affiant made to support the finding of probable cause made in the warrant.

In short, Task Force Office (TFO) Shane Lettau, a BPD detective, submitted a detailed search warrant to a Maryland District Court Judge. *See* Ex. 15.  The affidavit in support of the search warrant provided an overview of the investigation, the operations of the DTO, Roberts's relationship with G. Butler, and Roberts's use of two separate communications devices (Target Telephones 14 and 16) to facilitate drug transactions.  The affidavit explained in detail that drug customers would contact Roberts through one of the phones (using the same short messages as G. Butlers), and Roberts would direct the buyer to a subordinate.  The affidavit noted that Roberts communicated with his subordinates using FaceTime, but that on several occasions Roberts communicated with the customer while on the FaceTime call with his subordinates, which enabled law enforcement to understand the workings of the DTO.  *Id*. 15 at 7-8.  In other transactions, law enforcement overheard customers order drugs from Roberts.  After which, investigators observed the pen register capture communication from Roberts's phone via FaceTime to his subordinates.  *Id.* 15 at 8-11.

Based solely on the communications over his phones, investigators identified Roberts as a drug trafficker.  On April 1, 2019, investigators seized fentanyl from a buyer, who communicated with Roberts over one of his phones, and after the buyer met with one of Roberts subordinates.  Shortly after the seizure, investigators observed the subordinate meet with Roberts, who was operating the silver Honda (the Target Vehicle of the warrant).  Following this meeting, on April 2, 2019, investigators confirmed that Roberts spent the night at 2830 The Alameda (the Target Location of the warrant).  The Judge signed the warrant the same day.

### 3.  *Leon* Application

The Government maintains that the affiants provided ample probable cause to search each physical location in Exhibits 13-15; nevertheless, should this Court determine (after

providing deference to the magistrate under the totality of the circumstances that a substantial basis for concluding probable cause existed) that a particular warrant lacked probable cause, this Court cannot conclude that the affiants acted in bad faith.  Each affiant provided a detailed warrant to a neutral and detached magistrate, who reviewed and signed them.  The affidavits contained extensive details that the affiant believed amounted to probable cause.  This Court cannot now find that the affidavit supporting the warrants were so lacking in indicia of probable cause that the officer's belief in its existence of probable cause was unreasonable.

Moreover, the Fourth Circuit has held that no barrier exists to applying the *Leon* "good faith exception" where an experienced officer, "who swore out [an] affidavit and executed the search, acted with the requisite objective reasonableness when relying on uncontroverted facts known to them but inadvertently not presented to the magistrate." *United States v. McKenzie-Gude*, 671 F.3d 452, 460 (4th Cir. 2011);  *See also United States v. Marion,* 238 F.3d 965, 969 (8th Cir.2001) (holding uncontested information known to the executing officers "but not presented to the issuing judge" was "sufficient" to demonstrate their reliance on the warrant was "objectively reasonable");  *United States v. Dickerson,* 975 F.2d 1245, 1250 (7th Cir.1992) (finding officers acted in good faith when they knew facts not presented to the magistrate that gave them probable cause to search);  *United States v. Taxacher,* 902 F.2d 867, 871–73 (11th Cir.1990) (relying on facts known by the officer but not presented to magistrate in determining "whether the officer acted in objective good faith under all the circumstances.").  Judge Diana Motz wrote for the Court,

> Refusing to consider such information risks the anomalous result of suppressing evidence "obtained pursuant to a warrant supported by the affidavit of an officer, who, in fact, possesses probable cause, but inadvertently omits some information from his affidavit." [*United States v.*] *Bynum*, 293 F.3d [192] at 199 [(4th Cir. 2002)); *see also United States v. Owens*, 848 F.2d 462, 465–66

> (4th Cir.1988) (holding exclusionary rule inapplicable when officers made an "honest mistake" in reporting the wrong address in the affidavit and were thus "justified in using common sense and reliable information known to them outside the four corners of the warrant and affidavit").

*Id.* Accordingly, the warrants to search the premises should survive scrutiny, and in the rare circumstance that the Court finds a particular warrant lacked both probable cause and could not be objectively relied upon by the affiant on its face, the Court should permit the Government to augment the record with additional information to demonstrate that the investigators acted in good faith.

## B.    CELLSITE LOCATION INFORMATION (CSLI)

G. Butler (ECF# 943),[13] D. Butler (ECF# 948), and Preston (ECF# 952) moved to suppress law enforcement's acquisition of their historical and prospective cell site location information ("CSLI") from the various service providers to their particular cellular phones.

### 1.    Gregory Butler

#### a.    443-641-4783

G. Butler initialed moved to suppress the prospective CSLI the Government acquired from his telephone, 443-641-4753, that eventually became Target Telephone 1 of the wire investigation. G. Butler again argued that the warrant was not supported by probable cause, but even a cursory review of the affidavit confirmed that the affiant, who was investigating the drug trafficking activities of Timothy Downing, provided ample probable cause of criminal activity. *See* Exhibit 16A.

Law enforcement encountered Downing suffering from an overdose. As medical

---

[13]    Roberts moved to adopt ECF# 943, which includes G. Butler's motion to suppress the Government's acquisition of his CSLI. G. Butler's motion addresses the specific warrants related to his CSLI. Roberts fails to articulate any additional information. Additionally, most of the location information and probable cause regarding Roberts CSLI stemmed from the wire orders for Target Telephones 14 and 16 (discussed above).

personnel loaded Downing into an ambulance over 54 grams of fentanyl fell from his pocket – a quantity of drugs the affiant, who identified himself in the affidavit as having experience in drug investigations, called "consistent with distribution rather than personal use." *See* Ex. 16A at 5. Investigators analyzed Downing's cell phone and identified G. Butler's number listed as "Clow, Lamont BMore Conect" [sic]. The affiant opined, based upon his training and experience, that "Conect" meant "connect" or a drug source. Moreover, the affidavit indicated that text messages between the two devices "concerned the distribution of narcotics," *see* Ex. 16A at 8, and even provided the example of Downing ordering a quantity of drug consistent with the manner that G. Butler's DTO operated. Downing ordered "10 [of a type of controlled substance]" and the user of the target device responded with a location (3313 Powhatan Avenue). While G. Butler contended that these communications remain innocuous, to a trained narcotics investigator (like the affiant) they represented a fairly typical exchange of texts between a drug trafficker and customer.

Investigators continued to examine Downing's drug trafficking activities. The affidavit explained that investigators found that one of Downing's phones contacted G. Butler's 4753 phone over 1,200 times in a six-month period. They also determined that Downing traveled to Baltimore from his home or place of employment over 40 times but stayed in Baltimore between 15 and 40 minutes each time. Prior to these trips Downing contacted G. Butler's 4753 phone.

Finally, investigators observed Downing meet an unknown male in Baltimore after communicating with G. Butler's 4753 phones and watched an exchange between Downing and an unknown male before Downing returned to Frederick, Maryland. The affiant then opined that the user of the 4753 phone was a possible source of supply of controlled substance for Downing and sought the prospective or (real-time) CSLI for Butler's 4753 phone. On August 28, 2017,

33

United State Magistrate Judge (USMJ) Timothy Sullivan signed the warrant.

As the investigation continued, law enforcement introduced a confidential human source (CHS) to the user of G. Butler's 4753 phone. Acting under the direction of law enforcement, the CHS called G. Butler's 4753 phone and arranged to purchase drugs. Based in part on the continued use of the phone in connection to drug trafficking, USMJ Gina Simms continued the location monitoring of the device on January 22, 2018. *See* Ex. 16B at 13-15.

On two additional occasions USMJs authorized the continued receipt of CSLI for G. Butler's 4753 phone. Each time the affiant provided additional information to the court. For example, on January 25, 2018, investigators in Front Royal, Virginia advised the affiant that a CHS in Virginia was about to conduct a drug transaction with the user of G. Butler's 4753 phone. *See* Ex. 16C at 18-21. Following (in part) that information, USMJ Day authorized the continued receipt of CSLI for G. Butler's 4753 phone on February 23, 2018. Similarly, USMJ Sullivan continued authorization after investigators presented another affidavit for the receipt of CSLI for G. Butler's 4753 phone on April 9, 2018. In that affidavit, the affiant informed Judge Sullivan that G. Butler's 4753 phone continued to be used in furtherance of drug trafficking activities, and on March 6, 2018, Downing contacted the device and traveled to Baltimore where investigators observed Downing meet with a vehicle in same general area as his previous drug transaction, s*ee* Ex. 16D at 22-24, which they characterized as a drug transaction.

**b.      347-744-5958**

G. Butler also moved to suppress the prospective CSLI associated with his 5958 number. Investigators identified this number through a review of recorded jail calls. The affidavit explained that G. Butler provided this telephone number to law enforcement after the theft of his vehicle tags. Investigators then found inmates in the Maryland Correctional System contacted G.

Butler over this device.  The affidavit detailed a recorded jail call between an inmate, KH, his brother, Mooda, and G. Butler using the 5958 device.  During the call, KH asked G. Butler to give him "20 to start."  G. Butler replied, "I've got to call to see if I can find some."  KH eventually told G. Butler, I need you to do that for me…Cause I don't want to keep asking for no money."  *See* Ex.  16F at 15.  The affiant, again a trained narcotic investigator, opined that KH, who was incarcerated, wanted G. Butler to help him obtain a quantity of drugs to smuggle into the jail and sell.

Investigators obtained the CLSI for G. Butler's devices after they presented detailed warrants to three separate USMJs.  On each occurrence, the affidavit outlined continued use of the devices in furtherance of drug trafficking and the need to track the movement of the devices to develop information to prosecute the user of the devices.

### 2.    Darran Malik Butler

D. Butler moved to suppress the historical CSLI obtained by the Government for three of his cellular devices.  The Government presented the same affidavit for all three devise and listed the individual devices as (443) 630-4232 (Subject Phone 1); (410) 892-4947 (Subject Phone 2); and (443) 985-6073 (Subject Phone 3).

The affidavit (Exhibit 17) supplied ample probable cause regarding D. Butler's membership in the NFL and his possible connection to several violent acts and drug trafficking. First, the affiant explained to the USMJ that drug traffickers frequently use cellular telephone to "plan and coordinate drug trafficking activities."  The affiant also told the court that drug traffickers frequently engage in "violence," "possess firearms," "retaliate against other narcotics distribution organizations," and "provide monetary compensation and firearms to 'hit men' to execute the retaliation."  *Id.* at 4-5.

The affiant also listed several violent incidents between competing drug trafficking organizations in the NFL's territory. *Id.* at 9-10. The affiant then outlined detailed information linking D. Butler to some of those violent incidents.

The affiant then told the USMJ that law enforcement seized Subject Phone 1 and 3 after they arrested D. Butler following a vehicle pursuit where D. Butler ran from the car. Officers seized a loaded firearm, nineteen pill of suspected Oxycodone, which the affiant characterized as a quantity of drugs "consistent with distribution," over $7,000, and the two phones. Given the affiant's statements of experience; coupled with the quantity of drugs; the firearm; and D. Butler being the only occupant of the vehicle and fleeing from it, the affiant provided sufficient information to believe that Subject Phones 1 and 3 were D. Butler's phones and were probably used in furtherance of D. Butler's drug activity.

Similarly, the affiant noted that D. Butler provided Subject Phone 2 to an inmate over a recorded jail call. During that same call, D. Butler told the recipient of the call, to switch the number for his "go getta number," a phone D. Butler utilized for drug trafficking, and "look what kinda numbers they can do," referring to how much money they (other drug dealers) could make from his phone. *Id.* at 15. Finally, D. Butler discussed the "20 g's" that possibly related to the amount of money paid for the recent contract murder of a rival. *Id.*

Given these facts, investigators requested the historical location of these three phones associated with D. Butler, two seized from a vehicle after he was arrested driving the car with guns, drugs, and money, and the third phone discussed over the recorded jail phone as his drug trafficking phone. According to the affiant:

> It is believed that [D] BUTLER possessed each of the **Subject Phones** since his release in September 2018. **Subject Phones 1 and 3** were seized from BUTLER and remain in the custody of law enforcement from the time of his arrest. Investigators know that

cellular phones are extremely common items possessed by people. Specific to drug traffickers and individuals who commit crimes of violence, cellular devices are essentially tools of the trade to communicate and can place a person in a specific geographic region. Through the prior investigation of [D] BUTLER and other members of the NFL Enterprise, it is known that witness intimidation is a tactic utilized to maintain control of their activities.  At this time, no witnesses have been identified for any of the aforementioned crimes of violence and the two cooperating sources of information have relayed that they were not witnesses to any of the incidents.  Even if they were witness to any of the incidents, it is believed each would refuse to cooperate further out of the fear of retaliation.  Furthermore, through the conversation of [D] BUTLER, it has been confirmed that he was a drug trafficker. It is believed that evidence from the **Wireless Providers** could assist with the investigation by confirming or excluding [D] BUTLER's presence in the vicinity of any of the aforementioned crime scenes and could also reveal stash location(s), residences, or other locations relevant to the on-going investigation. Lastly, it is believed that **Subject Phone 2** was obtained by another member of this DTO and is being utilized in furtherance of the Subject Offenses. The use of the phone is a continuation of a criminal conspiracy involving [D] BUTLER and is believed that evidence gained from learning the location of **Subject Phone 2** will reveal additional evidence about the DTO and their relationship to BUTLER.

*Id.* at 17.

Despite this information, D. Butler argued that the affiant failed to "provide any information that would support the conclusion that the unique phone numbers and electronic serial numbers [the affiant] associated with those phones actually go with those phones." Def Motion at 8.  However, immediately before these statements, D. Butler, in his own motion, listed the identifiers for each of the Subject Phones provided in the affidavit.  While D. Butler remains free to argue the connection between any of the Subject Phones and himself[14] at trial, the Government need only show a probable connection between D. Butler and the devices to search for the CSLI; and that information is more than supported by probable cause in the affidavit.

---

[14]     Should D. Butler continue to assert that these devices are not his, then he has no standing to challenge these searches.

### 3.    D'Andre Preston

Like D. Butler, Preston moved to suppress the historical CSLI associated with his cellular telephone, and like D. Butler, Preston argued that law enforcement cannot attribute the particular telephone, (443) 651-5744, to him.  Similar to D. Butler's circular argument regarding the lack of identifiers for the Subject Phones, the Government does not have to show a definitive connection between Preston and the 5744 phone,[15] but a probable connection, which the affidavit in support of the warrant (Exhibit 18) did.

The affidavit detailed multiple acts of violence associated with ongoing racketeering investigation and the affiant's belief that Preston participated in at least one of these incidents, the murder of L.S.  The affiant informed the USMJ that law enforcement received an anonymous tip that D. Butler and Preston committed the crime.  The affiant also explained that video evidence of the crime showed an individual "displaying certain facial characteristics bearing a likeliness to [] Preston" despite Preston being concealed during the incident.  The affiant even provided a photo in the affidavit for the USMJ to compare and advised the judge that a cooperating witness identified the partially obscured individual in the video as Preston.  The affiant then explained that a prior warrant allowed law enforcement to obtain information from the Instagram account "belmont_whites," that "showed multiple pictures of [] Preston and it appeared that Preston was the primary user of the account."  *Id.* at 24.  Following these facts, the affiant explained that Preston (believed to be the primary user of the account) sent a direct message to another account with his telephone number (the 5744 number) after the other account requested it.

---

[15]     If Preston persists in this argument, the Government requires a strict proof of standing to challenge this search.

Given the firm connection between Preston and the murder of L.S., the identification and search of the "belmont_whites" IG account that appeared to be used by him, and the account user providing his telephone number upon request, ample probable cause existed to obtain the CSLI for Preston's 5744 phone.

### 4.   *Leon* Application

Each affidavit presented to a USMJ to obtain either historical or prospective CSLI provided robust probable cause and should be found admissible.   However, even if the Court determined that the probable cause was lacking for any or all of the devices, the affiants provided the information they believed amounted to probable cause to neutral magistrates who approved the searches.   Like the searches of the physical locations, *Leon's* good faith exception applies, and this Court should uphold any of these searches.

### C.   INSTAGRAM

D. Butler (ECF# 1148) and Preston (ECF# 923) moved to suppress the Government's acquisition of their Instagram (IG) accounts from Google.

### 1.   Darren Butler

D. Butler moved to suppress the search of his Instagram Accounts (IG) (ECF# 1148).   D. Butler claimed that the affidavit did not contain probable cause as to each of the accounts and regardless the search was overbroad.

Despite D. Butler's claims, the affidavit (Exhibit 19) contained ample probable cause. The affidavit began by providing a background of the NFL and the attendant violence associated with the enterprise.   The affiant then identified a confidential source (CS-1), who "ha[d] been found reliable…through independent corroboration," and provided background about two acts of violence (one fatal, one non-fatal) committed in the area, and indicated that "MALIK" with the

last name "BUTLER" committed them.  Within a week of obtaining this information, law enforcement identified MALIK as D. Butler and CS-1 confirmed his identify after being shown a photo of him.  CS-1 also told investigator that D. Butler was a hit man.

Law enforcement also obtained information from a second source (CS-2), whose information had been "found to be truthful and accurate," and who explained that the NFL contain several different rap groups, including VBE (Village Boyz Entertainment) but were all connected.  The affiant then confirmed that he corroborated this information because D. Butler posted social media photos where he identified as a member of VBE.

CS-1 then explained the D. Butler used an IG "westside_rod", and even explained how D. Butler assumed control of the account after the original user's death.  The affiant then confirmed CS-1's information by viewing the publicly available aspects of the accounts, which showed D. Butler committing a criminal act, possessing a firearm as a convicted felon all while wearing a gold chain with the letters VBE on it.  *Id.* at 13.

Investigators then identified another account used by D. Butler, "4eva_yb", where again in the publicly available aspects of the account, D. Butler displayed a photo of himself with a large amount of money visible from his pants pocket.  Another user, "love_it_hotz" then commented on the photo asking D. Butler "is that the money Scola pay [sic] u??" *Id.*

The affiant then detailed a series of events concerning the murder-for-hire of Dominic Gannt, who performed under rap name "Nick Breed."  Scola (Dajaun Cannidy) allegedly paid someone to commit that crime.  The implication from the post being Cannidy paid D. Butler to kill Gannt.  *Id.* at 13-15.  The affiant opined in the affidavit, "I believe that in the October 31, 2018 posting the user "love_it_hotz" was asking [D] BUTLER whether the money he was posing with were proceeds from the murder of Gantt and whether this money was paid by [] Cannady

(also known as "Skola"). I believe that [D] BUTLER admitted that the proceeds were, and asked "love_it_hotz" how the user knew this fact." *Id.*

Investigators identified a third account used by D. Butler, "nfl_lik" that the affiant noted remained private. D. Butler argued that given these circumstances law enforcement could not possibly obtain probable cause to search the account, but the affiant noted:

> While investigators have not been able to observe the content of [the "nfl_lik" account] due to its privacy settings, I believe that the page will contain evidence of [D] BUTLER's membership in a DTO and participation in drug trafficking in that [D] BUTLER has identified this page by his membership in the "NFL" DTO. I know from training and experience that drug traffickers, those involved in acts of violence, and persons who illegally possess firearms, are more likely to post incriminating social media material on their private accounts, as opposed to their public accounts. Furthermore, BUTLER's other identified Instagram accounts have included pertinent evidence regarding the subject offenses described in this warrant. Finally, since ["nfl_lik"] is BUTLER's "NFL" Instagram account, I believe it is likely investigators will find evidence regarding his membership in the conspiracy on the page, including communications with other members of the "NFL," and photos with co-conspirators and associates of the "NFL." I have observed publicly available postings made by other targets of this investigation who identify their Instagram accounts with the "NFL" tag and those accounts include photographs of members of the "NFL," as well as communications between affiliated members.

*Id.* at 16.

Given this information, coupled with the other publicly available IG accounts, and the CS information regarding D. Butler, probable cause existed to search this account. Carrying D. Butler's argument to a logical conclusion, law enforcement could never access a private IG account without direct access from a source of information or privately held content shared by a third party with law enforcement.

In addition, D. Butler's argument that the warrants were overbroad is equally without merit, the search parameters and list of things to be seized were limited by Attachment D to the warrant *Id.* at 27.  Moreover, The Government limited the time frame for the information to one month (September 1 to November 1, 2018) to coincide with the acts of violence under investigation.  *Id.*

### 2.     D'Andre Preston

Preston moved to suppress the search of his IG account "belmont_whites" (ECF# 923).  On January 22, 2020, the Honorable J. Mark Coulson, United States Magistrate Judge for the District of Maryland, issued a search warrant for the Instagram accounts of D'Andre Preston ("belmont_whites") and a juvenile named "D.G." ("muddywiththehoodie").  The search warrant affidavit in support of that warrant is attached to this response as Exhibit 20.

The search warrant described that investigators spoke with three confidential sources, who stated that Darran Butler, a/k/a "Lik" was a hitman who had carried out murders on behalf of the "NFL" Criminal Enterprise. *Id.* at 12-14.  Investigators further confirmed D. Butler's membership in the NFL Criminal Enterprise when they observed an NFL gang tattoo on his arm on November 1, 2018.  *Id.* at 13.  One confidential source told investigators that D. Butler committed two murders for hire on behalf of the NFL, including the murder of L.S.  *Id.* at 14.

The warrant also outlined the murder of L.S., describing how on October 31, 2018, two men, armed with handguns, chased L.S. into a convenience store at 200 N. Monastery Avenue in Baltimore, Maryland.  The gunmen shot L.S. numerous times, killing him.  The men then ran out of the convenience store.  *Id.* at 20.  The convenience store's surveillance cameras captured the murder.  While one of the gunmen wore a mask that completely obscured his face, the other

42

gunman, later identified as Preston, wore a mask that only partially covered his face.  The mask did not cover the area around Preston's nose, eyebrows, cheekbones, and forehead. Ex. 20 at 21.

The affidavit included a still photograph of that image, specifying what the affiant meant when he wrote that Preston bore a "close resemblance" to the partially masked shooter.  *Id*.  The affidavit also described that FBI investigators examined three of D. Butler's Instagram accounts, which revealed that he and Preston were close associates, who were pictured together on social media.  *Id.* at 27.  The affidavit included a photo of Preston and D. Butler standing together while D. Butler appeared armed, which provided a basis for a comparison with the surveillance photo. The affidavit also described that NFL member, Juawan Davis, discussing over an intercepted call that "Lik" (D. Butler) was "cracking watermelons" (killing people).  During the call, Davis indicated that he could identify the other shooter with Lik because he (the other shooter) was already around him (D. Butler).  The affidavit stated that at around the time of this interception, photos of the surveillance from the L.S. murder had been circulated publicly. *Id.* at 21.  Davis's statement about the relationship between the two shooters further corroborated the affiant's belief that Preston was the second shooter in the photo.

Finally, the warrant identified Preston's IG account, which the affiant stated he was familiar with from the investigation, and included Preston's nickname and the neighborhood where he and D. Butler frequented. *Id.* at 25.  The affidavit also established the basis for why the affiant sought Preston's IG account.  Specifically, the affidavit described how the affiant knew, from training and experience, that searching an IG account may reveal important geographic information in the form of geotags or latitude/longitude coordinates. The affiant also knew that users maintain messages and photos within their accounts that reveal plans or motives to commit

a crime.  The affiant also identified that the accounts may contain account identifiers that can reveal evidence of other devices used by the target. *Id.* at 32-36.

### D.    CELLPHONE CONTENT

D. Butler **(**ECF# 1143)[16] moved to suppress the search of his cellular telephone.  As noted above, law enforcement arrested D. Butler after a car chase where he abandoned the vehicle and attempted to hide from law enforcement.  During a search of the vehicle, BPD located two cellular telephones.  Exhibit 21 detailed law enforcement's efforts on three prior occasions to obtain the contents of these devices but were thwarted by the advanced security features of the phones.  *Id.* at 35-36.  Ultimately, on August 17, 2020 USMJ Copperthite authorized a fourth search to extract the data that proved successful.

Despite USMJs DiGirolamo (Exhibit 19), Gesner (20-0600 BPG), Sullivan (20-1090 TJS), and Copperthite (Exhibit 21) all finding the Government demonstrated probable cause to search the seized devices, D. Butler argued that the Government had failed to do so.

D. Butler's signed plea agreement obviates the need for the Government to particularize facts from the affidavit demonstrating probable cause.  The Government, however, relies upon Exhibits 19 and 21, along with the probable cause findings of two other USMJs to demonstrate that more than enough probable cause existed to search the devices.

## IV.    WARRANTLESS SEARCHES AND SEIZURES

The Government seeks the introduction of evidence seized without warrants from three of the defendants.  The first, which Roberts does not challenge, occurred on February 9, 2018.  On that date, law enforcement seized approximately six grams of fentanyl from Roberts's person.  The search occurred after co-defendant, Bobby Cannon, committed several traffic violations.

---

[16]     ECF#1143 appears on the docket as a motion filed on behalf of all defendants.  The motion itself; however; however, is particularized as to a Kyocera phone seized from D. Butler after his arrest on November 1, 2018.  As such, the Government believes this motion to be filed in error as to the other remaining defendants.

During the traffic stop, officers recovered drugs from Cannon's person as well as from the interior of the vehicle. Officers searched Roberts, who was the front seat passenger, and recovered the fentanyl. Co-defendant, Gregory Butler, was a rear passenger of the vehicle during the incident.

### A.     DARREN BUTLER'S NOVEMBER 1, 2018 ARREST

On November 18, 2018, BPD arrested D. Butler after he abandoned a vehicle in the 1300 block of North Longwood Street. During D. Butler's arrest, investigators seized a firearm, drugs, money, and cell phones. D. Butler moved to suppress the items seized from his person and vehicle (ECF# 922).[17]

### 1.     FACTUAL BACKGROUND

On the date in question, at approximately 9:30 p.m., Sergeant David Colburn ("Sgt. Colburn") received information from a source that an armed man, wearing a grey sweatshirt and gold-framed glasses, was in the 1900 Block of Mosher Street. Sgt. Colburn, along with Lieutenant James Klein ("Lt. Klein") and Officer Bruce Dhaiti ("Ofc. Dhaiti"), responded to Mosher Street in an unmarked police car. Upon arriving, Sgt. Colburn, who was sitting in the back right passenger seat of the car, saw D. Butler and a few other men engaged in what appeared to be an illegal dice game. D. Butler matched the description of the armed man provided by the source. The officers pulled alongside the dice game to investigate, at which point Sgt. Colburn noticed that the Defendant had a heavily weighted object consistent with the size and shape of a firearm in his front waistband area. Sgt. Colburn told Lt. Klein (who was driving) and Ofc. Dhaiti (who was in the front passenger seat) that he thought the D. Butler had a "gun in the front of his dip" and he and the other officers started to get out of the car.

---

[17]     D. Butler seeks to suppress a firearm that he entered a guilty plea to possessing in the Circuit Court for Baltimore City. *See* Circuit Court for Baltimore City Case Number: 118325009.

When they did, D. Butler conducted a security check, grabbing the heavy object in his front waistband area, and then walked to the driver's side door of a blue Honda Accord.  The officers repeatedly ordered the D. Butler to stop walking and not to get in the car.  Despite the officers' orders, the D. Butler got in the car and fled.  No one else was in the vehicle.  The officers pursued the D. Butler in their car and, with the assistance of the Baltimore Helicopter Unit, followed him to the 1300 block of North Longwood Street.

There, D. Butler parked his car and attempted to hide in some bushes behind a house on the street.  The officers ultimately found him, placed him in handcuffs, and recovered some money and a set of car keys from him.  Lt. Klein took D. Butler's keys, went to the now-parked Honda and opened the door.  In the front console area of the car, Lt. Klein found marijuana, 19 oxycodone pills, and a cellphone.   In the back of the console area, behind a partially removed panel, Lt. Klein found a firearm.  The officers subsequently arrested and charged D. Butler for a handgun violation.  Before taking D. Butler to the police station for processing, officers searched him again and found additional money, another cellphone, and the glasses he had been wearing. In total, officers recovered $7,140 from the Defendant.

## 2.    ARGUMENT

With respect to motions to suppress, the "burden of proof is on the party who seeks to suppress evidence." *United States v. Bello-Murillo*, 62 F. Supp. 3d 488, 491-92 (E.D.V.A. 2014) (internal citation omitted).  "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." *Id.* (internal citation omitted).

### a.    Officers Had Probable Cause to Arrest the D. Butler for Unlawful Possession of a Firearm

Officers may arrest someone without a warrant if probable cause exists that the person

has committed or is committing a crime. *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) (citing *Maryland v. Pringle*, 540 U.S. 366 (2003)). "The probable-cause standard is 'incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.'" *Id.* (quoting *Pringle*, 540 U.S. at 371). What's more, probable cause is an objective test. "The question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a 'reasonable ground for belief of guilt' that was 'particularized with respect to the person to be searched or seized.'" *Id.* at 658 (quoting *Pringle*, 540 U.S. at 371).

The Fourth Circuit and Supreme Court have recognized many factors that contribute to a determination of probable cause: tips from informants that have been independently corroborated, *Illinois v Gates*, 462 U.S. 213, 242-46 (1983); characteristics of armed individuals, including observing security checks and heavy objects that are consistent with the size and shape of a firearm in the defendant's clothing, *Humphries*, 372 F.3d at 660 (observing a security checks supports a finding of probable cause); *United States v. Black*, 525 F.3d 359, 365-66 (4th Cir. 2008) (observing a bulge consistent with the size of a firearm suggests the defendant may be in possession of a firearm); presence in a high crime area. *Humphries*, 372 F.3d at 657 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)); unprovoked flight. *See Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion"); and other kinds of "[e]vasive conduct that fall short of headlong flight." *Humphries*, 372 F.3d at 657 (citing *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993)) (noting that defendant's evasive conduct, including walking away from the officers and ignoring orders to stop, supported a finding of probable cause).

Here, BPD officers had probable cause to arrest D. Butler for unlawful possession of a

firearm at the time they found him hiding in the yard, which is prohibited under Maryland law. Md. Code, Crim. Law 4-203.[18]   Even if the officers lacked probable cause, they certainly possessed reasonable articulable suspicion authorizing a "pat down."  *See Terry v. Ohio*, 392 U.S. 1 (1968); *See also United States v. McCoy*, 513 F.3d 405, 410-11 (4th Cir. 2008). Moreover, the officers likely could have searched the vehicle based upon their probable cause belief that D. Butler left the gun in the car, *See Carroll v. United States* 267 U.S. 132 (1925); or conducted a "Terry frisk" of the interior of the vehicle to dispel their suspicion that the firearm was left in the vehicle.  *See Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983).

Despite the foregoing, D. Butler maintained that officers did not have probable cause to arrest him for unlawful possession of the handgun when they originally handcuffed him because, at the time, (1) officers had not actually found the firearm; and (2) officers had not confirmed whether he was allowed to possess a firearm.

As to point one, D. Butler cited no case that hold an officer *must* see a defendant in possession of a firearm to have probable cause to arrest him for unlawful possession of a firearm. Because no such cases exist.  Its well-established that officers do not have to see a crime occur to have probable cause to arrest an individual for that crime.  *See Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (probable cause sufficient to support an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect *has committed, is committing, or is about to commit an offense*") (emphasis added).  Probable cause can be and is often premised on circumstantial evidence derived from witnesses, informants, and the observations, training, and experience of the arresting officers.  *See United States v. One Parcel*

---

[18]     The officers also had probable cause to arrest the D. Butler for fleeing and eluding officers and for various traffic violations.

*of Real Estate*, 906 F.2d 110, 113 (4th Cir. 1990) (noting that probable cause can be established based on circumstantial evidence, even when no violation of law has been observed); *United States v. Abusnena*, 2021 WL 1080740 (E.D.N.C. Mar. 18, 2021) (holding that the officers had probable cause to arrest defendant for discharging a firearm, despite the fact that they had not actually seen him discharge the firearm and had not found the firearm); *United States v. Beckham*, 325 F. Supp. 2d 678 (E.D.V.A. 2004) (holding that officers had probable cause to arrest defendant for brandishing a firearm, even though officers had not seen the defendant brandish the firearm).  Given the totality of the circumstances, the fact that officers did not see the D. Butler in possession of the firearm at the time of his arrest is of no moment.  Accepting D. Butler's argument would create a bright line rule that directly contradicts the totality of the circumstances approach to probable cause outlined in *Illinois v. Gates*, and its progeny.

As to point two, the Supreme Court and Fourth Circuit have repeatedly recognized that an officer does not need to rule out all innocent explanations for factors that form the basis of probable cause to justify an arrest.  *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."); *Wardlow*, 528 U.S. at 125-26 ("Respondent and amici also argue that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true but does not establish a violation of the Fourth Amendment."); *Black*, 525 F.3d at 365-66.  In context, observations that traditionally give rise to arrests for unlawful possession of a firearm in Baltimore City—like having a heavy object in a pocket or grabbing a waistband—can often be justified by an innocent explanation. *Id.*  But that does not defeat a determination of probable cause.  We have never required officers to ask their suspects whether they are innocent or guilty prior to arresting them.  And that's

because doing so would unduly burden officers and essentially make it impossible to do their jobs. "[P]ersons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent." *Wardlow*, 528 U.S. at 126. That's just a fact, but it is not one that defeats probable cause.

**b.      Lt. Klein's Search of the D. Butler's Car was Lawful**

Because officers had probable cause to arrest the D. Butler for unlawful possession of a firearm, the search of the D. Butler's car was a proper search incident to a lawful arrest. The search of the car was also legal under the automobile exception to the warrant requirement.[19]

**1.      The Search of D. Butler's Car was a Proper Search Incident to a Lawful Arrest**

Under *Arizona v. Gant*, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 566 U.S. 332, 351 (2009). This well-recognized exception to the warrant requirement "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *See United States v. Robinson*, 414 U.S. 218, 230–34 (1973); *United States v. Thornton*, 325 F.3d 189, 192 (4th Cir. 2003) (*Thornton I*) ("The Court has often reiterated the 'two historical rationales for the search incident to arrest exception: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at

---

[19]      In the statement of probable cause, Sgt. Colburn noted that Lt. Klein searched D. Butler's car because he "observed a clear plastic bag containing a green plant material suspected marijuana in plain view in the center console] in front of the gear shift." However, that is not the case. Regardless, probable cause is an objective test. "[S]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 806 (1996); *see also Bond v. United States,* 529 U.S. 334, 338, n. 2 (2000). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause…. his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). Therefore, Sgt. Colburn's statement has no bearing on the objective legality of the search of the car.

trial.'"), *aff'd Thornton v. United States*, 541 U.S. 615 (2004) (*Thornton II*).

Here, D. Butler was a recent occupant of his vehicle, and it was reasonable for Lt. Klein to believe that D. Butler's car contained evidence of the offense of arrest: unlawful possession of a firearm.

With respect to determining whether someone is a "recent occupant," the Supreme Court and Fourth Circuit have recognized that courts should consider the defendant's "temporal or spatial relationship to the car at the time of arrest and search;" whether the car was in the defendant's control during his encounter with officers; whether the search was conducted at the scene of arrest; and the time lapse between the "elimination of danger" (*e.g.*, placing the defendant under arrest) and the search itself. *See Thornton II*, 541 U.S. at 621 (upholding search of defendant's car as a proper search incident to a lawful arrest when the search was conducted as the defendant sat in handcuffs in the back of the officer's patrol car); *see also United States v. Johnson*, 114 F.3d 435 (4th Cir. 1977) (upholding search of defendant's car as proper search incident to arrest when search was conducted while defendant was being driven to the police station). "Whether [the defendant] was inside or outside the car at the moment that the officer first initiated contact with him" is not dispositive. *Thornton II*, 541 U.S. at 622.

As previously explained, there was no one else in the car when D. Butler fled 1900 Mosher Street. After about an eight-minute chase, D. Butler parked his car on the 1300 block Longwood, got out of the car, and walked to a house across the street, where he hid in the backyard. Less than a minute later, officers arrived and apprehended him. No one approached the car between the time D. Butler parked and the officers' arrival. Immediately after the arrest, Lt. Klein walked to the car and searched it. Thus, the search was temporally close to the time of arrest—less than one minute passed; he was physically close to the car at the time of arrest—the

car was parked just around the corner from the place of arrest; he was in control of the car during the entire encounter and possessed the keys at the time of arrest—no one else was in the car with him or touched the car once it was parked; and officers conducted the search immediately after arresting him.

For the reasons above, Lt. Klein had probable cause to arrest the Defendant for unlawful possession of a handgun when they apprehended him after the chase. When Lt. Klein did not find the handgun on the Defendant while searching him immediately after his arrest, the next immediate location to believe the firearm could be located was the car, where D. Butler spent the proceeding nine minutes.

## 2. Automobile Exception

Under *Carroll v. United States*, police may search a car without a warrant if the car is "readily mobile and probable cause exists to believe it contains contraband." 267 U.S. 132 (1925); *United States v. Kelly*, 592 F.3d 586 (4th Cir. 2010) (upholding search of car based on automobile exception where car suspects were already in handcuffs and officers had the keys to the car). With respect to the concept of mobility, the Supreme Court has recognized that there is no "separate exigency requirement' apart from the inherent mobility of the automobile." *Id.* In other words, "[c]ourts need not determine the probability in each case that someone would have driven the car away during the time it would have taken the police to secure a warrant." *Id.* (citing *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (per curiam). A car is "readily mobile" as long as it is "being used on the highways" or is "readily capable of such use" rather than, say, "elevated on blocks." *Id.* (Carney, 471 U.S. at 392–93, 394 n. 3); *United States v. Gastiaburo*, 16 F.3d 582 (4th Cir.1994) (upholding car search based on automobile exception even though the police had impounded the car, rendering it "virtually impossible for anyone to drive the car away

or tamper with its contents"). "[O]nce police have probable cause, they may search "every part of the vehicle and its contents that may conceal the object of the search." *Id.*

### 3.   Inevitable Discovery Doctrine

Under the inevitable discovery doctrine, "the government [may] use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" United States v. *Bullette*, 854 F.3d 261, 265 (4th Cir. 2017).

The Fourth Circuit and a number of courts in the District of Maryland have recognized that an inventory search is often "inevitable" within the meaning of the inevitable discovery doctrine. *Id.* (affirming the district court's denial of defendant's motion to suppress, reasoning that the evidence at issue recovered from Defendant's vehicle would have been inevitably discovered during an inventory search); *see e.g., United States v. George*, 971 F.2d 1113, 1120–21 (4th Cir. 1992) (acknowledging that the inevitable discovery doctrine may apply when officers would have recovered the evidence at issue in the course of a properly performed inventory search); *Chambers*, 59 F. App'x at 510–11 (holding that the district court properly permitted introduction of evidence recovered from a vehicle because it would have been inevitably discovered during the course of an inventory search), *cert. denied*, 538 U.S. 1051 (2003); *United States v. McCullum*, 469 F. App'x 194, 197 (4th Cir. 2012) (unpublished opinion) ("A routine inventory search policy may serve as the basis for the admission of evidence under the inevitable discovery doctrine."); *United States v. Hariston*, 409 F. App'x 668 (4th Cir. 2011) (unpublished opinion) (holding that the evidence at issue obtained from the subject vehicle was admissible under the inevitable discovery doctrine because the officers would have inevitably conducted an inventory search and found the items), *cert. denied*, 563 U.S.1028 (2011).

Here, if the Court finds that the search of the car at the scene of the arrest was unlawful, contrary to the Government's position, the firearm, drugs, phone, and other items found in the car are all still admissible because it would have inevitably been discovered during the course of a lawful inventory search. Pursuant to BPD's policy on towing procedures, a vehicle must be towed if the driver of the car is arrested, and the owner, co-owner, or a licensed driver with the consent of the co-owner is not readily available to take the car. Specifically, the tow policy states:

> A vehicle driven by an arrested driver may be released by the arresting officer to: The owner/co-owner of the vehicle; or A licensed driver with the consent of the owner/co-owner. . .If the arresting officer does not release the vehicle, tow the vehicle to the City Yard. . .

And "[w]hen a vehicle is being towed to the City Yard," officers must "inventory all personal and detachable property of value not removed from the vehicle by the owner or operator." *Id.* at 6. The Towing Policy is non-discretionary in this regard.

Here, officers arrested the driver and sole occupant. No one else available to take the car. As such, the car had to be towed and because a proper inventory search required searching "all of the vehicle's contents," including unlocked portions of a vehicle's interior, the center console would have inevitably been opened and searched. *See Bullette*, 854 F.3d at 266–67.

Therefore, even if this Court determines that the initial search on scene was unlawful, the items found in the car are still admissible under the inevitable discovery doctrine.

## B.     D'ANDRE PRESTON's ARREST MARCH 20, 2020

On March 20, 2020, members of the BPD Southwest District Action Team (DAT) arrested Preston on an open arrest warrant and seized from his person a Ruger .40 caliber handgun. Preston now moves to suppress that firearm (ECF# 920).

### 1.     FACTUAL BACKGROUND

On January 22, 2020, BPD officers arrested Preston for distributing narcotics in the 3000 block of Normount Court in Baltimore, Maryland.

On January 22, 2020, BPD officers surveilled Preston and two other men, "K.L." and "M.W.," via helicopter surveillance.  Officers watched Preston retrieve suspected narcotics from a clear plastic bag he was holding and hand them to another individual.  The man then handed cash to Preston.  *See* Ex. 23 at 7.  Several minutes later, K.L engaged in a similar hand-to-hand transaction with another suspected drug customer.  After the drug sale occurred, officers approached the man.  The man then tossed a capsule of suspected narcotics that the officers retrieved from the ground. *Id.*

Half an hour later, officers saw M.W. exit a vacant dwelling, 3004 Normount Court, and meet with Preston and K.L.  Preston then ran into the nearby woods and appeared to retrieve an object from the ground.  When Preston walked out of the woods, he handed a bag to K.L.  This bag also appeared to contain narcotics, indicating that Preston retrieved the narcotics from the woods.  *Id.* at 7-8.  Officers later saw M.W. walk into the same wooded area and place a bag in the area.  An officer traveled to this location and found the bag, which contained approximately 1,000 gelatin capsules of fentanyl.  *Id.* at 8-9.  Officers also searched 3004 Normount Court, the vacant location where they observed Preston, M.W., and K.L repeatedly accessing during their surveillance.  Inside the vacant dwelling, officers recovered, among other property, multiple bags and boxes of empty vials, suspected cocaine base, and two digital scale with suspected drug residue.  *Id.* at 9.

On March 6, 2020, the Honorable Melissa Phinn of the Circuit Court for Baltimore City issued an arrest warrant for Preston for his alleged violation of a probation in a 2019 case, based

upon his January arrest.  *See* Exhibit  22.[20]

On March 10, 2020, USMJ Beth Gesner issued an arrest warrant for Preston, charging him with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846.   The charge also related to a January 22, 2020 arrest.  *See* Exhibit 23

On March 26, 2020, BPD officers were patrolling in the 3000 block of Normount Court when an officer saw Preston walking.  The officer correctly believed that Preston had an outstanding arrest warrant for his violation of probation.    The officers detained Preston, confirmed the existence of the warrant and his identity, and arrested him.  Pursuant to the arrest, an officer searched a satchel that Preston had slung over his shoulder. The officer found a .40 caliber handgun loaded with ammunition, a bottle containing suspected marijuana, and a plastic bag containing suspected marijuana. The officer also searched Preston's pants pockets and found two Oxycodone pills.

### 2.       ARGUMENT

A valid arrest warrant provides arresting officers with probable cause to arrest a person identified in the arrest warrant.  *See Utah v. Strieff*, 136 S. Ct. 2056, 2062 (2016); *see also Baker v. McCollan*, 443 U.S. 137, 143-144 (1979); *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 580 (E.D.Va. 2012).   Courts have long recognized that a search incident to a lawful arrest is a traditional exception to the warrant requirement. *United States v. Robinson*, 414 U.S. 218, 224 (1973).  Where probable cause exists to arrest a person, the police may search an arrestee and the area "within his immediate control." *Chimel v. California*, 395 U.S. 752, 763 (1969).   The existence of a valid arrest warrant authorizes officers to search the person and his possessions. *United States v. Grandison*, 783 F.2d 1152, 1156 (4th Cir. 1986) (citation omitted); *see also*

---

[20]       Judge Phinn's violation of probation (VOP) warrant is based upon the state arrest that occurred on January 22, 2020.  The federal arrest warrant, based on the criminal complaint occurred after the state arrest and the issuance of the VOP warrant.

*United States v. Currence*, 446 F.3d 554, 559 (4th Cir. 2006) (holding that search incident to arrest pursuant to a misdemeanor arrest warrant was lawful).

Here, officers arrested Preston pursuant to valid arrest warrants issued by state and federal judges.  Officers were therefore permitted to search Preston, as well as the satchel he was carrying at the time of the arrest. Accordingly, the firearm and drugs recovered from Preston were lawfully recovered.

> a.   **The affidavit in support of the federal arrest warrant established probable cause**

Preston argued that the Court should suppress the evidence recovered because the federal criminal complaint, upon which the federal arrest warrant was based, failed to establish probable cause of a crime. The Court should reject this argument.  The officers arrested Preston, based on a valid state arrest warrant for violation of probation, and a review of the affidavit in support of the federal criminal complaint and arrest warrant demonstrated that probable cause to believe that Preston conspired to distribute controlled substances on January 22, 2020.

To support the issuance of a warrant for arrest, "[e]vidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest." *Hupp v. Cook*, 931 F.3d 307, 318 (4th Cir. 2019).  In other words, "probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Sennett v. United States,* 667 F.3d 531, 535 (4th Cir. 2012) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)) (internal quotation marks omitted). "Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than that required by the preponderance-of-the-evidence standard, *See Gates,* 462 U.S. at 235; *United*

*States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false."). In making a probable cause determination, a magistrate must use a "totality-of-the-circumstances analysis." *Id.* at 233. Furthermore, a "magistrate's determination of probable cause should be paid great deference by reviewing courts." *Id.* at 236

Here, the affidavit showed that Preston, K.L., and M.W. worked together to sell narcotics in the 3000 block of Normount Court. The affidavit showed that Preston and K.L each sold drugs to two customers. *See* Ex. 23 at 7. The affidavit also showed that Preston supplied a bag of drugs to K.L. by retrieving the drugs from a hidden area in the woods and handing it to K.L. M.W. also resupplied Preston and K.L. by delivering a bag filled with fentanyl to this same hidden area. *Id.* 8-9. The affidavit also established that the three men used a vacant dwelling to store drugs and drug processing materials. *Id*. at 9. Preston argued that the warrant failed to establish probable cause because officers did not recover drugs from Preston or see him retrieve drugs from the bag filled with the 1,000 gel capsules of fentanyl. Since Preston, K.L., and M.W. worked together to sell narcotics, it does not matter whether Preston accessed the bag with the 1,000 gel capsules of fentanyl or possessed drugs on him when the police arrested him. The affidavit established a "fair probability" to believe that Preston agreed to sell narcotics on January 22, 2020 with K.L. and M.W. *See Gates*, 462 U.S. at 235. Therefore, the Court should reject Preston's argument.

b.    ***Leon* Applicability**

Even if the Court finds that the federal arrest warrant was not supported by probable cause, Preston's motion to suppress should be denied because the officers relied in good faith on the warrant's validity. *United States v. Leon*, 468 U.S. 897, 922 (1984); *see also United States v.*

*Waiters*, 760 F. App'x. 156, 158-59 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 89 (2019) (unpublished). The exclusionary rule does not apply when law enforcement officers act in "objectively reasonable" reliance on a warrant later held invalid. *Leon*, 468 U.S. at 922. Accordingly, searches executed "pursuant to a warrant will rarely require any deep inquire into reasonableness." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 267 (1983)).

Preston in his motion argued that he had not yet received a copy of the arrest warrant for the violation of probation upon which the officers based their arrest; however, since the filing of Preston's motion, the Government provided Preston a copy of the arrest warrant.[21]  The warrant for violation of probation was dated March 6, 2020 and signed by the Honorable Melissa Phinn, a Circuit Court Judge for Baltimore City.  *See* Exhibit 22.  The return of the warrant even listed the service date as March 26, 2020, the date of Preston's arrest.

### c.      Valid State Arrest Warrant

Preston requested permission to supplement his response should the Government produce the state arrest warrant, *see* Def Mtn at 7.  Certainly, the Government does not object to Preston supplementing his record, but, as noted, a search conducted incident to arrest - of the person and areas or containers within his immediate control – is a well-established exception to the warrant requirement.  *See e.g., Michigan v. DeFillippo*, 433 U.S. 31, 35 (1979); *United States v. Robinson*, 414 U.S. 218 (1973); *United States v. Currence*, 446 F.3d 554, 558-59 (4th Cir. 2006). Even where the warrant may be invalid, an agent's good faith reliance on the existence of the warrant would not undermine either the arrest or the subsequent search incident thereto.  *See United States v. White*, 342 F.2d 379 (4th Cir. 1965).

---

[21]      Law enforcement arrested Preston, pursuant to a valid arrest warrant, and searched his person incident to arrest.  Given these facts, the defendant may require the Government to produce a witness to testify that the satchel from which law enforcement seized the evidence was on his person – although these facts are largely not in dispute, and testimony should not be required.

Here, little doubt exists that the agents possessed a valid arrest warrant issued by a Circuit Court Judge.  In fact, the officers, who made the arrest knew Preston and of the existence of the warrant.  There is little additional arguments Preston can make, and the Court should deny his motion to suppress.

## V.  SEVERANCE

Each of the Defendants either filed motions to sever or adopted a co-defendant's severance motion.  On June 11, 2021, Preston filed a motion to sever (ECF# 819).  The Court ordered the Government to respond (ECF# 833), and Government counsel complied on August 13, 2021 (ECF# 858).  Preston then replied to that motion on August 23, 2021.  The docket does not reflect whether the Court ruled on Preston's original motion.

D. Butler filed two motions for severance (ECF# 925).  The first included a motion to dismiss Counts One and Two and to sever Counts Eleven and Twelve from the Fourth Superseding Indictment.  In the second, D. Butler sought to sever himself from the co-defendants (ECF# 1146).  G. Butler and Roberts adopted D. Butler's motion (ECF# 925), and Roberts filed his own motion to sever himself from his codefendant (ECF# 1133).

### A.  D. BUTLER'S MOTION TO DISMISS AND SEVER COUNTS

As noted, D. Butler filed a motion to dismiss Counts One and Two of the indictment and moved to sever Counts Eleven and Twelve from the trial.  Codefendants G. Butler and Roberts adopted this motion.  *See* ECF# 946 and 1141 (respectively).

#### 1.  BACKGROUND

The Fourth Superseding Indictment charged D. Butler with participating in a violent racketeering enterprise, the NFL gang in Baltimore.  NFL members earned money by selling narcotics and committing murder-for-hire, including D. Butler's October 31, 2018 murder of

"L.S."  The issue raised by D. Butler is whether the murder of L.S. may form the basis of racketeering conspiracy, drug conspiracy, and murder-for-hire charges within a single indictment.

The short answer is yes.  Courts have long held that overt acts that comprise a racketeering conspiracy, including separate conspiracies, may also be charged as substantive counts in the same indictment.  *See United States v. Rodriguez*, 971 F.3d 1005, 1013-14 (9th Cir. 2020); *see also United States v. Warneke*, 310 F.3d 542, 546 (7th Cir. 2002), *as amended on denial of reh'g and reh'g en ban*c (Jan. 10, 2003) (holding that conspiracy to commit an enumerated crime of "racketeering activity" may serve as a predicate for a RICO count); *United States v. Marino*, 277 F.3d 11, 28–31 (1st Cir. 2002); *United States v. Haynie*, 8 F.4th 801, 805 (8th Cir. 2021).  Because D. Butler and Preston murdered L.S. in furtherance of the racketeering enterprise, the Government can still charge D. Butler with separate offenses related to the murder.

On March 20, 2019, a federal grand jury in the District of Maryland returned an Indictment, charging twenty members and associates of the NFL criminal enterprise with the conspiracy to distribute controlled substances and related offenses.  *See* ECF# 1.  On April 10, 2019, May 22, 2019, and January 3, 2020, the grand jury returned a Superseding Indictment, Second Superseding Indictment, and Third Superseding Indictment.  ECF#s 126, 211, and 447.  The indictments charged additional defendants in the drug trafficking conspiracy and added substantive criminal offenses related to the conspiracy.

On September 15, 2020, the grand jury returned a Fourth Superseding Indictment (ECF# 628).  Count One of the Fourth Superseding Indictment charged D. Butler, Preston, Roberts, and G. Butler, with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).  Count Two charged

the same individuals, *inter alia*, with the conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846. Count Eleven charged D. Butler, Preston, and Roberts with conspiracy to use interstate communication facilities to commit murder-for hire, in violation of 18 U.S.C. § 1958. Count Twelve charged D. Butler and Preston with the use of interstate communication facilities to commit murder-for hire, also in violation of 18 U.S.C. § 1958.

The racketeering conspiracy charged all four defendants with participating in the NFL criminal enterprise. The Fourth Superseding Indictment alleged that beginning in 2016 and continuing into March 2020, the gang committed four murders and one attempted murder, retaliated against witnesses, and distributed large volumes of narcotics. As set forth in that Fourth Superseding Indictment, one of the central purposes of the NFL criminal enterprise was to enrich members and associates of the gang through narcotics trafficking, murder, and brokered killings (i.e., murder-for-hire). ECF 628 at ¶5(a).

One of the charged, brokered, murders was the murder of L.S, committed by D. Butler and Preston. In October 2018, defendant James Roberts solicited D. Butler and Preston to murder L.S. because Roberts knew of a bounty for the murder. *Id*. at ¶ 38. On October 31, 2018, D. Butler and Preston murdered L.S. by chasing him into a convenience store and repeatedly shooting him. Later that night, D. Butler posted on social media a photo of him with cash proceeds he received for killing L.S. *Id.* at ¶ 40.

Count Two of the Fourth Superseding Indictment re-alleged the overt acts described in the RICO conspiracy count as part of the conspiracy to distribute controlled substances. *Id.* at 18. Count Two pertained to the ongoing drug trafficking conspiracy that involved not only the member of the NFL racketeering enterprise, but other individuals, who were not member of the NFL. Counts Eleven and Twelve charged the conspiracy to murder and the murder of L.S. by D.

Butler, Preston, and Roberts.  *Id.* at 29-30. As described above, each of these offenses constitute predicate acts of the racketeering conspiracy charged in Count One.

>  2.   **ARGUMENT**

>>  a.   **An indictment may charge an overt act of the racketeering conspiracy and also from the basis for other conspiracies**.

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, was enacted October 15, 1970, as Title IX of the Organized Crime Control Act of 1970. RICO punishes persons who engage in a "pattern of racketeering activity" as part of their involvement in an "enterprise" that affects interstate or foreign commerce. 18 U.S.C. § 1962(c). Under the RICO statute, "racketeering activity" includes state offenses of murder and robbery, as well as more than one hundred serious federal offenses, including narcotics trafficking, witness intimidation, witness tampering, and murder-for-hire. 18 U.S.C. § 1961(1).  RICO also makes it a crime to conspire to participate in an enterprise that engages in this pattern of racketeering activity. 18 U.S.C. § 1962 (d).

The broad scope of RICO arises from Congress's intent to eradicate organized criminal activity by bringing "highly diversified acts of a single organized crime enterprise under RICO's umbrella." *United States v. Eufrasio*, 935 F.2d 553, 566 (3d Cir. 1991).  RICO therefore enables prosecutors to charge diverse and unrelated predicate acts in a single racketeering count so long as the conduct was committed in furtherance of one of the enterprise's purposes.  *See id*.  This includes conspiracies and other inchoate crimes.  Courts have long recognized that a racketeering conspiracy count may be comprised of other conspiracies because they are "distinct offenses with entirely different objectives." *United States v. Pungitore*, 910 F.2d 1084, 1135 (3d Cir. 1990).  The objective of a racketeering conspiracy is to further the affairs of the charged enterprise, whereas the goals of the predicate conspiracy are to achieve the goals of each

individual conspiracy. *See id.* (citation omitted); *see also United States v. Zemek*, 634 F.2d 1159, 1170 n. 15 (9th Cir. 1980), *cert. denied*, 450 U.S. 916 (1981); *see also United States v. Khan*, 461 F.3d 477, 493 (4th Cir. 2006) (citations omitted).  This diverges from the historic rule that prohibited a single conspiracy count from being comprised of multiple conspiracies. *See United States v. Irizarry*, 341 F.3d 273, 293 n.7 (3d Cir. 2003)(holding that a RICO conspiracy count "supported by predicate acts of racketeering activity that in themselves are conspiracies, does not violate the principle of *Kotteakos v. United States*, 328 U.S. 750 (1946), which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy.")

In the context of racketeering conspiracies that allege acts of murder, "[i]t is a well-established principle of RICO law that a murder conspiracy can be a predicate racketeering act under § 1962(c), and that predicate racketeering acts that are themselves conspiracies may form the basis for a charge and eventual conviction of conspiracy under § 1962(d)." *United States v. Rodriguez*, 971 F.3d 1005, 1013-14 (9th Cir. 2020); *see also United States v. Warneke*, 310 F.3d 542, 546 (7th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (holding that conspiracy to commit an enumerated crime of "racketeering activity" may serve as a predicate for a RICO count); *United States v. Marino*, 277 F.3d 11, 28–31 (1st Cir. 2002); *United States v. Haynie*, 8 F.4th 801, 805 (8th Cir. 2021).

Here, the racketeering conspiracy count alleged that a central purpose of the NFL enterprise was the enrichment of members by violence, including murder and "brokered killings." ECF 628 at ¶5(a) (Fourth Superseding Indictment). The indictment alleged that D. Butler, as well as defendants Roberts and Preston, conspired and ultimately murdered L.S. for financial gain. *Id.* at ¶¶ 38-40.  State charges of murder and federal charges of murder-for-hire are enumerated offenses of racketeering activity. 18 U.S.C. § 1961(1).  Therefore, since the

murder of L.S. furthered one of the express purposes of the NFL enterprise, the racketeering conspiracy count properly alleged the murder of L.S.  The indictment may also charge D. Butler, Preston, and Roberts for the murder of L.S. as part of the drug trafficking conspiracy and murder-for-hire conspiracy because while they relate to the racketeering enterprise, they are distinct offenses.

<strong>b.  L.S's's. murder furthered the racketeering enterprise</strong>

D. Butler's argument for severance or dismissal of counts hinges on his belief that the murder of L.S. did not relate to the NFL racketeering enterprise.  D. Butler argued that because a non-member of the NFL paid for the murder of L.S., than the conspiracy to murder L.S. by NFL members fell outside the scope of the criminal enterprise.  The Court should reject this argument for two reasons.

First, Butler's argument requires the Court to reject the grand jury's determination that the murder of L.S. furthered the NFL racketeering enterprise. The Supreme Court, however, has repeatedly held that the grand jury's probable cause determination that a person committed a crime is free from "…any review, oversight, or second guessing." *Kaley v. United States*, 571 U.S. 320, 328 (2014); *see also Costello v. United States*, 350 U.S. 359, 362 (1956) (holding that grand jury's finding probable cause to initiate a prosecution cannot be challenged); *United States v. Williams*, 504 U.S. 36, 54 (1992). D. Butler's argument requires this Court to invade the province of the grand jury's probable cause determination by adopting an alternative interpretation of the facts proffered by D. Butler.  While D. Butler, Preston, or Roberts may advance this argument at trial, the Court should not disturb the grand jury's determination that the murder of L.S. furthered the NFL racketeering enterprise.

Second, D. Butler's argument misapprehends the nature of the racketeering conspiracy as

65

charged in the Fourth Superseding Indictment. The Fourth Superseding Indictment alleges that NFL members profiteered by carrying out acts of murder-for-hire, including the murder of L.S. ECF# 628 at ¶¶5(a), 38-40.  These opportunities sometimes originated from within the gang, such as the June 16, 2018 murder of W.E. and J.H., *see* ECF# 628 at ¶¶ 32-34, and in other instances an associate of the gang offered money for the murder of a rival, as in the case with L.S.  It is irrelevant whether these murders were paid for by gang members or outsiders because a purpose of the NFL was to profit from carrying out murder-for-hire, regardless of who paid the money.  Accordingly, the murder of L.S. is appropriately charged as an overt act of the racketeering conspiracy.

Similarly, with respect to the conspiracy to distribute controlled substances as alleged in Count Two, the Fourth Superseding Indictment re-alleged the conduct charged in Count One as part of the conspiracy to distribute controlled substances.  D. Butler suggested that the same conduct cannot serve as predicates for two different conspiracies, but "[c]ourts have recognized that one conspiracy can serve as the predicate for another conspiracy when the [overarching] conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives." *Khan*, 461 F.3d 477, 493 as amended (Sept. 7, 2006) (internal quotations and citations omitted). Accordingly, the Court should reject Butler's argument that Counts One and Two should be dismissed.

### c. Each count charges a discrete offense

D. Butler also argued that because the murder of L.S. was alleged in Count One and Count Two as overt acts that the counts are duplicitous and should be dismissed.  An indictment is duplicitous when it "charges two offenses in one count." *United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017).  A duplicitous indictment creates "the risk that a jury divided on two

66

different offenses nonetheless convict for the improperly fused double count." 627 F.3d 941, 957 (4th Cir. 2010).   The murder of L.S., as alleged in Count One, is a predicate offense of racketeering conspiracy.  It is not a separate offense charged in the count with another separate offense.  *See United States v. Yarborough*, 852 F.2d 1522, 1531 (9th Cir. 1988) (holding that RICO count that contained multiple predicate acts involving the same conduct was not duplicitous).  Since each offense charged in the Fourth Superseding Indictment constitutes a distinct offense, none of the courts in the indictment are duplicitous.

### B.        D. BUTLER'S AND ROBERTS'S MOTION TO SEVER

Both D. Butler and Roberts filed motions to sever themselves from the joined trial of G. Butler, Preston, D. Butler, and Roberts.  Each argue that the combined trial would unfairly prejudice them due to the varying degrees of involvement in the RICO enterprise and proof against each codefendant; the possibility of competing legal theories; or the inability of the codefendants to call each other at trial.

### 1.        Neither Defendant Has Met the Burden of Showing Prejudice Sufficient to Justify Severance.

Rule 14 of the Federal Rules of Criminal Procedure provides in part that, "[i]f it appears that a defendant or the government is prejudiced by joinder of offenses or of defendants . . . the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires."   Generally speaking, however, "when defendants are indicted together, they should be tried together," *United States v. Dinkins*, 691 F.3d 358, 368 (4th Cir. 2012), particularly where a conspiracy is charged, *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983).  As the Supreme Court has explained:

> There is a preference in the federal system for joint trials of defendants who were indicted together.  Joint trials play a vital role in the criminal justice system.  They promote efficiency and serve

> the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. For these reasons, we repeatedly have approved of joint trials.

*Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal citations and quotation marks omitted). The Courts of Appeal review the denial of a motion to sever for abuse of discretion and "will not reverse a denial of a motion to sever absent a showing of clear prejudice." *Dinkins*, 691 F.3d at 367-68; *see also United States v. Smith*, 451 F.3d 209, 219 (4th Cir. 2006) ("Assuming that a joinder of two or more defendants for trial was proper in the first instance, we will not overturn the trial court's denial of a severance motion, unless an appellant can show that the joint trial resulted in a "miscarriage of justice").

Both Roberts and D. Butler argued that the varying degrees of evidence and culpability in various acts of the NFL enterprise will cause unfair prejudice or prevent the jury form "compartmentaliz[ing] the evidence." Despite their concerns, no right to severance arises because evidence against one defendant is stronger than evidence against another. *United States v. Singh,* 518 F.3d 236, 255 (4th Cir. 2008); *United States v. Harris,* 498 F.3d 278, 291-92 (4th Cir. 2007). Moreover, the Court with careful instructions can educate the jury on how to review various evidence.

Roberts, in particular, claims that he will be denied a right to confront witnesses because he fears the Government will introduce statements made by other codefendants against him. Again, careful instructions by the Court will prevent any unfair prejudice, but as Roberts is well aware statements of conspirators are admissible in trials despite the inability to cross-examine the conspirator, *see* Fed R. Evid 801(d)(2)(e), and it is not a basis for severance. In fact, a strong argument could be made that the use of coconspirators statements in the same trial mandates continued joinder.

D. Butler also claimed that the "inevitable pursuit of different trial strategies…will deprive [him] of control over his defense," but he offered no evidence to support conflicting or competing defenses.  The standard for severance set forth in *United States* v. *Najjar* is that severance is required where there is "such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other" or "the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." 300 F.3d 466, 474 (4th Cir. 2002).D. Butler proffered no specific prejudice that would flow from a joint trial.  His motion presents only the bald allegation.  *See United States v. Spitler*, 800 F.2d 1267, 1272 (4th Cir. 1986) ("A district judge is not required to be a mind reader in order to grant or deny a severance motion based on vague and conclusory representations that there might be some conflicting testimony of defendants.  Where, as here, the defendant fails to state the nature of his defense and in what respect, if any, his defense is irreconcilable with that of his co-defendant, there is no basis to grant the defendant's motion for severance.").  Even if a defendant made such a showing, "[t]he presence of conflicting or antagonistic defenses alone does not require severance under Rule 14(a)."  *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2006).  Courts have routinely rejected arguments that severance was required in cases in which both or all antagonistic defendants could be found guilty.  In *Lighty*, the Fourth Circuit held that "Lighty and Flood's defenses, while conflicting on certain points, were not mutually antagonistic to the point where the jury was required to believe the core of one defense and disbelieve the core of the other."  *Lighty*, 616 F.3d at 349.

There is a clear consensus among the Courts of Appeals that severance is not required in cases involving such blame-shifting.  *Dinkins*, 691 F.3d at 369 ("Hostility among defendants, and even a defendant's desire to exculpate himself by inculpating others, do not of themselves

qualify as sufficient grounds to require separate trials."); *United States v. Ortiz*, 315 F.3d 873, 898 (8th Cir. 2002) (defendant could not "demonstrate clear prejudice merely by showing that one defendant tried to shift blame to another defendant"); *United States v. Plato*, 629 F.3d 646, 650 (7th Cir. 2008) ("Since *Zafiro*, we have consistently held that blame-shifting among codefendants, without more, does not mandate severance."); *see also Zafiro*, 506 U.S. at 540 ("[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."); *cf. United States v. Blankenship*, 382 F.3d 1110, 1125 (11th Cir. 2004) ("The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for a jury to believe both co-defendants' defenses.").  Neither D. Butler, Roberts, nor any of the remaining defendants have proffered any specific prejudice that would occur from a joint trial. Accordingly, they are not entitled to severance.

> **2.      Any Potential Prejudice Suffered from the Presentation of Mutually Antagonistic Defenses or Disparities in the Strength of Evidence Can Be Cured by the Court's Instructions.**

Rather than the radical remedy of severance, courts have long favored limiting instructions to the jury.  *United States v. Cardwell,* 433 F.3d 378, 388 (4th Cir. 2005); *Najjar*, 300 F.3d at 475.  Any potential prejudice suffered as a result of the joint trial can be addressed by the limiting instructions provided at trial.  "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion."  *Zafiro*, 506 U.S. at 538-39.  Measures less drastic than severance, "such as limiting instructions, often will suffice to cure any risk of prejudice."  *Id.* at 539.  *See id.* at 541 (instruction sufficed to cure any possibility of prejudice where district court instructed jury that the government had the burden of proving beyond a reasonable doubt that each

defendant committed the crimes with which he or she was charged; the jury must give separate consideration to each individual defendant and to each separate charge against him; each defendant is entitled to have his or her case determined from his or her own conduct and the evidence applicable to him or her; and the arguments are not evidence and that no inferences should be drawn from a defendant's exercise of the right to silence); *Plato*, 629 F.3d at 651 ("Nothing in this paradigmatic case of blame-shifting codefendants suggests a basis for severance. Any possibility for prejudice was cured by the district court's instruction to the jury to consider each defendant separately.").

## VI.    ADOPTED MOTIONS

G. Butler (ECF# 946), D. Butler (ECF# 1147), and Roberts (ECF# 1141) filed motions to adopt the motions of other defendants, including Bobby Cannon's, who has since entered a plea of guilty.

### A.    MOTION TO STRIKE PARAGRAPH

Cannon filed a motion to strike paragraph 52 of the Fourth Superseding Indictment (ECF# 931). G. Butler and Roberts adopted this motion. Cannon claimed that the paragraph delt with the murder of an individual with whom G. Butler had an altercation with at a casino. Cannon argued that this overt act was surplusage because this murder could not have been in furtherance of the enterprise.

Presumably, Cannon was moving, pursuant to Fed. R. Crim P. 7(d), to strike the alleged surplusage in the charging document. The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974), or unnecessary, or inflammatory, *Dranow v. United States*, 307 F.2d 545, 558 (8th Cir. 1962). A

Rule 7(d) motion is addressed to the discretion of the district court, and therefore, an appellate

court, in determining whether a district court has erred in refusing to strike certain language from

an indictment, reviews the district court's decision to see if that decision constituted an abuse of

discretion. *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971); s*ee also United States v.

Poore*, 594 F.2d 39, 41 (4th Cir. 1979).

"[A] motion to strike surplusage from the indictment should be granted only if it is clear

that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United

States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir.1998) (internal alteration and quotations marks

omitted); *see also United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir.2006) ("[I]nformation

that is prejudicial, yet relevant to the indictment, must be included for any future conviction to

stand and information that is irrelevant need not be struck if there is no evidence that the

defendant was prejudiced by its inclusion.").

The required relationship between racketeering acts exists when the acts "have the same

or similar purposes, results, participants, victims, or methods of commission, or otherwise are

interrelated by distinguishing characteristics and are not isolated events," although they are not

the exclusive facts to establish the relationship. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240

(1989); *See also United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992); *United States v.

Angiulo*, 897 F.2d 1169, 1180 (1st Cir. 1990) (holding that dissimilar racketeering acts involving

a conspiracy to commit a murder and running an illegal gambling business were both related to

the affairs of the enterprise).

In the context of violent gangs charged with racketeering, courts have recognized that

acts of violence committed by gang members relate to the affairs of the enterprise where the

crimes served the purpose of bolstering the gang's reputation.  For example, the Fourth Circuit

held in *United States v. Mathis* that the government sufficiently established a "pattern of racketeering activity," where the government introduced evidence of twelve racketeering acts leading up to a kidnapping and murder. Those crimes shared the common purpose of enriching gang members, bolstering the gang's reputation for violence, or evading law enforcement authorities. In committing these crimes, the defendants employed firearms, threats of physical force, and actual physical force. The jury could conclude, based on this evidence, that the defendants had engaged in a "pattern of racketeering activity." *Mathis*, 932 F.3d 242, 260 (2019).

In *United States v. Tipton*, the defendant claimed that his violent actions were motivated by a desire to get revenge for "a purely personal grievance." 90 F.3d 861, 891 (4th Cir. 1996). Rejecting the defendant's argument, the Fourth Circuit found the evidence sufficient to support the jury's determination that the actions were committed for the purpose of maintaining or increasing his position within the racketeering enterprise. *Id.* In particular, the Court emphasized that the attacks were carried out "in part at least in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all" and because "furthering the reputation for violence [is] essential to maintenance of the enterprise's" reputation. *Id; see also United States v. Moten*, 617 F. App'x 186, 190 (3d Cir. 2015)(Even though there may have been additional personal motivations for the conduct, the charged acts were all committed to demonstrate the [gangs'] authority and dominance over their territory and thus were in furtherance of the enterprise); *United States v. Irizarry*, 341 F.3d 273, 302–03 (3d Cir.2003) (murder of man who burglarized a mafia enforcer's apartment was act in furtherance of RICO enterprise because it served to "send a message to someone who would demonstrate such complete disrespect of [mafia enforcer's] stature in the enterprise").

73

Here, the indictment alleges that beginning in 2016 and continuing into March 2020, the gang committed four murders and one attempted murder, retaliated against witnesses, and distributed large volumes of narcotics.  As set forth in the indictment, one of the central purposes of the NFL criminal enterprise was to enrich members and associates of the gang through narcotics trafficking, murder, brokered killings (i.e., murder-for-hire), and retaliation against witnesses. *Id.* at ¶5(a).  Another purpose of the gang was to promote and enhance the reputation and scope of the enterprise and its members' activities.  *Id.* at ¶5(b).  The gang achieved these goals through a variety of ways.   For example, NFL members regularly used, carried, brandished, and discharged firearms in connection with the gang's illegal activities.  *Id. at* ¶10.  NFL members used violence, threats of violence to, and public displays of aggression to deter witnesses from cooperating and to punish those who did.  *Id.* at ¶12-15.  NFL members also committed murders or attempted to commit murders on behalf of the enterprise. This included murder-for-hire schemes where NFL members offered bounties for the murders of witnesses or rivals. Other NFL members murdered or attempted to murder these witnesses and rivals on behalf of the enterprise. *Id.* at 24.  In particular:

1.    **June 16, 2018 Murder of W.E. and J.H.**

In 2018, G. Butler, Roberts, and other NFL members believed W.E., a member of the NFL enterprise, cooperated with the government.  G. Butler and Roberts responded by offering a bounty for W.E.'s murder.  *Id.* at ¶31.  Roberts solicited NFL members to commit the murder on behalf of the gang.  *Id.* at ¶32.  On the night of June 16, 2018, W.E. and his girlfriend, J.H., were sitting on a porch of a residence in the 3900 block of Edmondson Avenue.  Bobby Cannon walked up to the porch and shot W.E. and J.H. multiple times with a .40 caliber pistol, killing them. Almost immediately following the deaths of W.E. and J.H., the message spread amongst

the community that W.E. was murdered because he cooperated with law enforcement. Following the murder of W.E. and J.H., Roberts paid Cannon for the murders. Cannon has since pled guilty to these crimes.

### 2.    October 21, 2018 Murder of D.G.

Following the murder of W.E., G. Butler, Roberts, and other NFL members feared that D.G., the cousin of W.E., would retaliate against them. D.G. lived in Edmondson Village and identified as an NFL member. Although D.G. was an NFL member and not cooperating with the law enforcement, G. Butler, Roberts, and another NFL member decided to pay for his murder. *Id.* at ¶35. On October 21, 2018, D. Butler murdered D.G., shooting him several times at point blank range in the 500 block of Normandy Avenue. Following the murder, D. Butler bragged about killing D.G. Roberts later paid D. Butler for the murder. *Id.* at ¶36. On November 27, 2018, law enforcement intercepted a NFL member, Juawan Davis, discussing the murder.

### 3.    October 31, 2018 Murder of L.S.

In October 2018, a drug trafficker in Baltimore offered money for the murder of L.S., a rival of the drug trafficker. Roberts, wanting to collect the bounty, solicited D. Butler and Preston to murder L.S. *Id.* at ¶38. On October 31, 2018, D. Butler and Preston murdered L.S. after chasing him into a convenience store and repeatedly shooting him. Later that night, D. Butler posted on social media a photo of himself with cash proceeds he received for murdering L.S. *Id.* at ¶40.

### 4.    November 2018 Conspiracy to Murder M.H.

G. Butler and Roberts believed that M.H. a former member of the NFL who had left the gang, had stolen drug proceeds and offered money for the murder of M.H. In November 2018, law enforcement arrested M.H., pursuant to a federal arrest warrant issued from a USMJ sitting

in the Western District of Virginia.  Prior to being transported to that district, M.H. was housed at the Chesapeake Detention Facility ("CDF") in Baltimore, which serves as a pre-trial detention facility for federal defendants.  On November 5, 2018, M.H. entered CDF. On that same day, G. Butler and Roberts discussed the arrival of M.H. at CDF.  In a text exchange, G. Butler and Roberts coordinated having M.H. "hit" by two detainees at CDF.  Roberts also stated that he would smuggle a contraband cell phone to the detainees to coordinate because he and another NFL member were working with a corrupt corrections officer.

### 5.    January 4, 2019 Attempted Murder of D.J.

In December 2018, a drug trafficker from the Gilmor Homes area of Baltimore met with Roberts and offered a bounty for the murder of D.J.  Roberts and Cannon then conspired to murder D.J. to collect the bounty.  *Id.* at ¶46.  Roberts and Cannon determined that D.J. lived at a halfway house in Baltimore.  On January 4, 2019, Cannon borrowed a vehicle from another NFL member and drove to the halfway house.  Video surveillance showed Cannon's vehicle waiting for hours outside of the halfway house.  Once D.J. arrived, Cannon got out of the vehicle, walked up to D.J. and repeatedly shot him.  D.J. fled to the median of a busy street and Cannon returned to his vehicle. Cannon then drove up to D.J., fired at him again, drove away, returned from another direction, and shot D.J. a third time.  D.J. survived, despite being struck multiple times by gunfire.  BPD later recovered ballistics evidence from the scene and compared it to ballistics evidence recovered from the W.E. and J.H. murders.  Comparison of the evidence revealed that many of the cartridge casings were fired from the same firearm.

### 6.    March 2019 Conspiracy to Murder T.W.

In or around early 2019, G. Butler and Roberts were involved in separate physical altercations with T.W.  Because of the physical altercations, G. Butler and Roberts wanted T.W.

killed.  In March 2019, G. Butler, Roberts, and Cannon coordinated by phone to kill T.W.  Text messages revealed that the defendants were looking for T.W. at various clubs in Baltimore and waiting for T.W.  In another message, G. Butler complained to an unidentified associate that Roberts had been following T.W. but lost him in the club.  In April 2019, T.W. was shot in the hand by an unknown assailant.  G. Butler later learned of this based on his review of a news story about the shooting and, presumably, the efforts to kill T.W. ended.

Contrary to Cannon's claim, which G. Butler and Roberts adopted, this particular crime falls squarely within the stated purpose of the enterprise including "promoting and enhancing the reputation and scope of the [] [e]nterprise" and "keeping victims and witnesses in fear of the [] [e]nterprise…its leaders, members, and associates through acts of violence, threats of violence, and public displays of aggression."  *See* ECF# 628 at 3-4.  Had the NFL permitted an individual to have a public altercation with its leaders, the overall reputation of the enterprise could be diminished.  The conspiracy among the individuals continued to promote the enterprise as a violent drug trafficking organization that individuals should fear.

Moreover, because several codefendants already entered guilty pleas and the Fourth Superseding Indictment includes overt acts related solely to them, it is unlikely (even with heavy redactions) that the charging document will be permitted to reviewed by the jury during deliberation.  Accordingly, the possibility of unfair prejudice is nil.

### B.     MOTION TO DISMISS COUNT TWO

Cannon filed a motion to dismiss Count Two of the Fourth Superseding Indictment (ECF# 928).  Cannon argued that the Court should dismiss Count Two, pursuant to Rule 12(b)(3)(B), because the Government cannot prove an essential element of the charge – namely that he personally distributed a quantity of controlled substances that caused serious bodily harm

to individuals.  Presumably, D. Butler and Roberts, who adopted this motion (See ECF# 1147 and 1141 (respectively)), claim these very specific facts as well.

In reviewing a motion to dismiss, the district court must accept all factual allegations in the indictment as true. *United States v. Oaks*, 302 F.Supp.3d 716, 720 (D. Md. 2018).  Further, the court should construe the indictment in a "practical," as opposed to a "purely technical," manner. *Id.* (citing *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)). *See also United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss [a count of the] indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").  As such, Count Two is not defective or deficient in any way, and Fed Crim R. 12(b)(3)(B) is not an appropriate mechanism to advance Cannon's arguments.

Assuming *arguendo*, that Rule 12 provides the appropriate remedy,  Cannon correctly noted that the Government must prove that an individual charged with conspiracy to distribute controlled substances resulting in death or serious injury was in some way involved in the "chain of distribution" that caused the injury (a fact to be found by a jury that does not concern the legal sufficiency of the allegations).  Cannon ignored the fact that mere conspiracy to distribute controlled substances is a lesser included offense.  *Burrage v. United States*, 571 U.S. 204, 210 n.3 (2014).

The Government must plead and prove to a jury beyond a reasonable doubt the "death results" enhancement because it increases the minimum and maximum sentences of the underlying drug conspiracy count.  *See Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Essentially, the jury must determine whether Cannon (or the remaining defendant who adopted his motion) participated in a conspiracy to distribute controlled substances.  Then in a separate

special verdict determine whether any of the individual distributions associated with the conspiracy resulted in death or serious bodily harm. Even in a case cited by Cannon, the Sixth Circuit remanded the case for *resentencing* after the jury instructions omitted a requirement that the defendant be "part of the distribution chain," but did not vacate the conviction for conspiracy to distribute controlled substances. *United States v. Hamm*, 952 F.3d 728, 741 (6th Cir. 2020).

Count Two merely placed the defendants on notice of the possibility of enhanced sentences. Should the Government fail to produce evidence that these defendants were not the "but for" causation of any victim's death or serious injury (essentially a sentencing enhancement element), the Government will not submit that particular question to the jury; however, because the defendants participated in a racketeering enterprise, the purpose of which was, in part, to distribute controlled substances, a jury could easily find the defendants to be members of the drug conspiracy without finding the "death resulting" enhancement element. Dismissal of the entirety of Count Two is an extreme remedy, not permitted by Rule 12, invades the province of the jury, and is inappropriate here.

### C.   DISCOVERY MOTIONS

Cannon filed a series of motions that appear to either be adopted by other defendants or filed by more than one defendant in error. First, Cannon filed a motion to disclose coconspirators' statements prior to trial (ECF# 926) and a motion to exclude untimely evidence (ECF# 942). These two motions also appear on each of the remaining defendant's dockets. They appear to have been inadvertently filed in the entire case rather than by Cannon individually. Additionally, Cannon filed several motions that his codefendants adopted. Cannon filed a motion to disclose confidential informants and early disclosure of *Brady* material (ECF# 935) and a motion to disclose coconspirators (ECF# 939). Taken together these motions amount

to an effort by the defense to ferret out the Government's theory of the case and lay out an order of proof complete with the witnesses and evidence.

### 1.   MOTION TO EXCLUDE UNTIMELY EVIDENCE

First, Cannon, and presumably by extension the remaining defendants, demanded to exclude evidence that was produced in an untimely fashion (ECF# 942).   Cannon filed the motion on October 29, 2021 claiming that the Government produced too much evidence too close to trial for him to appropriately prepare.   Without commenting on the timing of the production of evidence or the proximity to trial, this motion is now moot.   The Court moved the original trial date, and the production of materials occurred almost a year ago.   Since that postponement, the Government has followed the Court's exacting schedule, and no significant additional amount of discovery has been produced.

### 2.   MOTION TO IDENTIFY CO-CONSPIRATORS, THEIR STATEMENTS AND COOPERTATORS

The remainder of these discovery motions essentially demand that the Court order the Government to help the defense prepare for trial by identifying coconspirators (ECF# 935), their statements (ECF# 935) and the cooperators (ECF# 935) the Government intends on using at trial. These types of discovery motions are generally disfavored, and the Government continues to adhere to the Court's production schedule agreed to by the parties.   In an effort to advance resolutions in this matter, the Government will consider earlier production of Jencks material and cooperators' testimony, but in a manner that prevents danger to these witnesses.   The overt acts in this prosecution clearly show that this enterprise kills cooperators and witnesses to further their goals.   The Government must balance those genuine safety concerns against the need to resolve this matter.

To the extent that the defendants are seeking early designation by the Government of co-

conspirator statements, disclosure is not mandated by either Federal Rule of Evidence 801(d)(2)(E) or 104(b) and neither defendant has cited authority for this early disclosure. There is no such requirement that the Government disclose these statements except as required by 18 U.S.C. § 3500, *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972).

The request violates the Jencks Act, which holds that:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness (other than the defendant) shall be the subject of subpoena, discovery or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500(a). *See United States v. Roberts*, 811 F.2d 257, 258 (4th Cir. 1987) (vacating decision of panel that affirmed order by the district court for suppression of co-conspirator statements under 801(d)(2)(E) after the government refused to comply with an order to disclose all such statements; *United States v. Percevault*, 490 F.2d 126, 131 (2nd Cir. 1974) ("pretrial discovery of statements made by prospective witnesses during the lifetime of a conspiracy is not governed by Rule 16(a) … and is not permitted by the Jencks Act."). The Fourth Circuit has held that pretrial discovery of all statements and documents in the possession of the United States Attorney is not warranted without a showing that favorable evidence is being withheld. *United States v. Harris*, 409 F.2d 77, 80 (4th Cir. 1969).

The Fourth Circuit has also held that a trial court is not required to hold a pre-trial hearing to determine the admissibility of co-conspirator statements. *United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir. 1983). Rather, a trial court may "admit conditionally the declarations of co-conspirators before the conspiracy has been independently established, subject to the subsequent fulfillment of that factual predicate." *Id. See also United States v. Caudle*, 758 F.2d

994, 998 (4th Cir. 1985) ("this court has never required a pretrial determination of the existence of a conspiracy"); *United States v. Blevins*, 960 F.2d 1252, 1256 (4th Cir. 1992) ("This circuit has rejected the formalistic requirement that there must be a hearing to determine the existence of a conspiracy before statements can be admitted under Rule 801(d)(2)(E)" but instead "we allow a trial court to conditionally admit co-conspirators' statements subject to the subsequent satisfaction of the requirements for their admission"). As long as the Government is able to prove the existence of a conspiracy and that the statements made by co-conspirators were in furtherance of such conspiracy, its evidentiary burden is met and the statements at issue are admissible. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Moreover, it is practically impossible at this point (more than three months in advance of trial) for the Government to identify which statements will be used at trial. As of the date of this response, over half of the charged defendants have pled guilty (one signed his plea agreement on August 31, 2022) and it is anticipated that other defendants will plead guilty prior to trial. Therefore, at this point, it would be unduly burdensome for the Government to be ordered to designate which co-conspirator statements it intends to use at trial given the uncertainty of which of the remaining defendants will ultimately elect to go to trial.

Finally, as discussed above, 18 U.S.C. § 3500 provides that witnesses' statements need not be turned over until the witness has testified on direct examination. 18 U.S.C. § 3500(a). Through the Court's discovery orders, the Government has agreed to turn over material defined in 18 U.S.C. § 3500, along with related *Giglio v. United States*, 405 U.S. 150 (1972) material, such as witnesses' plea agreements, criminal convictions, and prior inconsistent statements, in advance of trial. Thus, all defendants will have access to statements of co-conspirators that the Government intends to call as witnesses prior to the time required by statute. For this reason

alone, the motion should be denied.

### 3.    BILL OF PARTICULARS

Cannon also demanded a Bill of Particulars (ECF #929), which Roberts adopted (ECF# 1141).  Under the well-established law of the Fourth Circuit, that motion should be denied.

A defendant is not entitled to a bill of particulars as a matter of right.  *Wong Tai v. United States*, 273 U.S. 77, 82 (1927).  Notwithstanding what appears to be the premise underlying defendants' motions, a bill of particulars is not intended to serve as the equivalent of answers to interrogatories in a civil case.  Rather, a bill of particulars is a defendant's means of obtaining specific information about charges brought in a vague or broadly-worded indictment.  *United States v. Dunnigan*, 944 F.2d 178, 181 (4th Cir. 1991), citing *United States v. Debrow*, 346 U.S. 374, 378 (1953), *rev'd on other grounds*, 507 U.S. 87 (1993).  As a general matter, an indictment is sufficient if it alleges the essential elements of the crime with which a defendant is charged in a manner that permits the defendant to prepare a defense and plead double jeopardy in any future prosecution for the same offense.  *Hamling v. United State*s, 418 U.S. 87, 117 (1974); *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988); *United States v. American Waste Fiber Co.*, 809 F.2d 1044, 1046 (4th Cir. 1987).  As long as the indictment fulfills these purposes, a bill of particulars is unnecessary and its denial does not constitute an abuse of discretion.  *United States v. Butler*, 885 F.2d 195, 199 (4th Cir. 1989); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir.1985). If an indictment is deficient, the "purpose of a bill of particulars is to enable the defendant to obtain sufficient information on the nature of the charges against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973).  *Accord United States v. Dulin*, 410 F.2d 363,

364 (4th Cir. 1969).  But if, as here, the indictment fully complies with the requirements of the Fifth and Sixth Amendments and Fed. R. Crim. P. 7(c), "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial."  *United States v. Automated Med. Lab., Inc*., 770 F.2d 399, 405 (4th Cir. 1985); *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir.1996).  As another circuit has stated: "A bill of particulars, unlike discovery, is not intended to provide the defendant with the fruits of the government investigation. . . .  Rather, it is intended to give the defendant only that minimum of information necessary to permit the defendant to conduct his own investigation."  *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) (citations omitted; emphasis in original); *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980), *cert. denied*, 449 U.S. 1015 (1980) (a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial"); *Hemphill v. United States*, 392 F.2d 45, 49 (8th Cir. 1968) ("[a]cquisition of evidentiary detail is not the function of the bill of particulars");  *United States v. Fischbach and Moore, Inc*., 576 F. Supp. 1384, 1389 (W.D. Pa. 1983) ("[i]t is well established that a bill of particulars is not to be used by the defendant as a discovery tool, . . . by which defendants obtain disclosure of every detail of the theory and preparation of the government's case. . . ."), *aff'd*, 750 F.2d 1183 (3d Cir. 1984).

Similarly, a bill of particulars is even more inappropriate when the government supplements an indictment with extensive discovery.[22]  In this case, the Government has provided the defendants with extensive discovery, including police reports, autopsy reports, FBI 302's, wiretap affidavits, and audio recordings.  The defendants have also been given copies of search warrant and wiretap affidavits, detailed reports documenting the execution of search

---

[22]     Several of Cannon's motions note the number of terabytes of information disclosed by the Government in discovery.

warrants and a list of all physical evidence seized during the investigation.   Additionally, all tangible items seized are available for defense counsel to review whenever they choose.   As the Fourth Circuit held in *United States v. SIGMA*, 624 F.2d 461, 466 (4th Cir. 1979), such "extensive disclosure by the Government" renders a bill of particulars inappropriate.

A motion for a bill of particulars should be denied where the defendant is inappropriately seeking to require the government to "weave the information at its command into the warp of a fully integrated trial theory for the benefit of the defendants."   *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971).

Here, Cannon's demand, and presumably Roberts's, deals primarily with his participation in the drug conspiracy as alleged in Count Two of the Fourth Superseding Indictment.   Cannon claimed that the Government is attempting to hold him responsible for fourteen overdose deaths and seeks specifics as to his involvement in each.   As noted above, the Fourth Superseding Indictment simply puts the defendant on notice (as required) that should a jury find that death or serious bodily injury were foreseeable to him as part of the drug conspiracy, he could be subject to enhance penalties should the jury make particular findings.   Moreover, other Counts in the same Fourth Superseding Indictment attribute specific deaths or overdoses to individual defendants, and do not specially charge Roberts.

 For the foregoing reasons, it is clear that the defendants' motions for a bill of particulars should be denied.   In this case, the government has provided the defendants with extensive discovery to which the defendants have had access for several months.   Moreover, the Fourth Superseding Indictment complies with the requirement that all essential elements of the alleged crimes be pleaded, including elements that may increase minimum mandatory or statutory maximum sentences.   Therefore, in light of the case law and the specific circumstances of this

case, a bill of particulars is simply not warranted.

### 4.    DISCLOSURE OF EXPERTS

G. Butler adopted Cannon's Motion to Order the Government to Disclose its Experts (ECF# 938).  The Government previously provided nearly ten pages of Expert Witnesses the Government intended to call and a summary of their testimony.  Moreover, the Court's scheduling order set September 6, 2022 as the deadline for that production.  This motion is moot.

### 5.    DISCLOSURE OF 404(b) EVIDENCE

Several defendants, G. Butler (ECF# 947); Preston (ECF#953); and Roberts (ECF# 1142) moved for the disclosure of 404(b) evidence.  The Court's scheduling order required the Government to provide notice of Rule 404(b) evidence on or before August 22, 2022.  On or before that date, the Government informed counsel that the Government had no intention of introducing evidence "extrinsic" to the charged racketeering conspiracy.  As such, the Government possessed no 404(b) evidence to disclose.  Also, on August 22, 2022, this Court entered an order (ECF# 1164) requiring the defendants to supplement by August 29, 2022, their motions and provide the Court with any deficiencies in the Government's disclosure.  Because the Government provided no notice of 404(b) evidence and the defendants did not supplement their filings.  The Court should deny as moot ECF# 947, 953, and 1142.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions.

Respectfully submitted,

Erek L. Barron
United States Attorney


_____

James T. Wallner

John W. Sippel
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

The Government hereby certifies that a copy of the foregoing was filed via the Court's

CM/ECF system providing notice to counsel for defendants.

_____
James T. Wallner
Assistant United States Attorneys

87